**LOCAL UNION NO. 1, BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION, AFL–CIO, CLC, Plaintiff,**

v.

**MEL–O–CREAM DONUTS INTERNATIONAL, INC., Defendant.**

No. 02–3356.

United States District Court, C.D. Illinois, Springfield Division.

May 19, 2004.

Gilbert A. Cornfield, Melissa J. Auerbach, Cornfield & Feldman, Chicago, IL, for Plaintiff.

Keith J. Braskich, Davis & Campbell, David Jones, Hinshaw & Culbertson, Peoria, IL, for Defendant.

## ORDER

SCOTT, District Judge.

This matter came before the Court on January 26, 2004, for bench trial. Present for Plaintiff Local Union No. 1 (Local 1) was counsel Gilbert Cornfield. Also present was Jethro Head, president of Local 1. Present for Defendant Mel–O–Cream was counsel David Jones. Also present for Mel–O–Cream was Dave Ryan, Mel–O–Cream human resources director, and Keith Braskich[1].

---

1. Braskich is also counsel of record for Mel–O–Cream, but not counsel for purposes of

Local 1's First Amended Complaint was brought pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and seeks to compel arbitration of grievances filed September 27, 2002, and October 11, 2002. Count I claims that Local 1 is entitled to an order to arbitrate these grievances because the Collective Bargaining Agreement between the parties became effective on September 19, 2002, and the grievances were filed after that date. Count II claims that Local 1 is entitled to arbitration of these grievances because on September 19, 2002, an implied-in-fact interim agreement, which included an arbitration clause, was created. Alternatively, Count II asks this Court to make a determination on the merits of the grievances filed pursuant to an implied-in-fact interim agreement. This Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.

The Court finds that the parties formed a Collective Bargaining Agreement (CBA) on October 11, 2002. That is the date that the parties manifested their intention to be bound. Before October 11, 2002, the parties did not manifest an intent to be bound to a CBA, nor did their actions create an implied-in-fact interim agreement. The grievances filed October 11, 2002, were filed contemporaneously with the formation of the CBA, and therefore, the Court orders Mel–O–Cream to submit these grievances to arbitration. Mel–O–Cream is not required to submit the grievances filed September 27, 2002, to arbitration. This Order constitutes the findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.

## STATEMENT OF FACTS

Local 1 is a labor organization within the meaning of § 301 of the LMRA, and Mel–O–Cream is an employer within the meaning of § 301. Local 1 and its predecessor represented a bargaining unit of Mel–O–Cream employees covered by a collective bargaining agreement effective from May 1, 1999, through April 30, 2002. In March 2002, the parties began negotiating a successor collective bargaining agreement.

On or about July 5, 2002, Braskich, counsel for Mel–O–Cream, sent a letter to Head which stated: "Enclosed is the Company's last and final offer, as set forth at the end of our meeting on July 4. This document includes the items that have been agreed upon, and also those portions of the contract where Company proposals on the open items are set forth." *J. Ex. 5.* On July 7, 2002, Local 1 commenced a strike. *Pretrial Order,* p. 3, ¶ 12, *Transcript,* p. 20.

On July 8, 2002, Ryan sent Head a letter which invited all striking workers to continue working. He also informed Head that the company might hire replacement workers, and if permanent replacements were hired, the company would retain those employees even if the strike concluded. The striking employees would be offered positions on the basis of need and if vacancies occurred. Ryan stated that:

Inasmuch as the Union has terminated the Labor Agreement, and no new contract is in effect, the Company will discontinue applying the securities, dues checkoff, and arbitration provisions of the expired contract. Those provisions will become effective once a new contract is signed.

*J. Ex. 6.*

In a letter to Head dated July 16, 2002, Ryan noted that:

On July 4, 2002, the Company presented the Union with its last and final offer. . . .

trial, since he was called as a witness.

On July 6, 2002, the Union rejected the Company's final offer. On July 7, the Union commenced a strike against the Company.

It is our position that the parties are at an impasse. Please be advised that the Company intends to implement its last and final offer at 10:00 p.m. on July 21, 2002.

*J. Ex. 7.* In a letter to Head dated August 20, 2002, Ryan stated that Mel–O–Cream had hired 26 employees since the strike began, and the company considered those 26 employees as permanent replacements. *J. Ex. 8.*

At an August 29, 2002, meeting, Local 1 presented Mel–O–Cream with a proposal regarding the return of striking workers once the strike terminated, and Mel–O–Cream again took the position that the employees hired after the strike began were permanent replacements. *Pretrial Order,* p. 4, ¶¶ 17–18. On September 4, 2002, Head sent Ryan a letter requesting information regarding the replacement of striking employees and a letter requesting information on the union's August 29, 2002, proposal. *J. Exs. 10 and 11.* Also on September 4, 2002, Local 1 filed a charge with the National Labor Relations Board (NLRB) claiming that Mel–O–Cream had engaged in unfair labor practices. *Tr.* p. 116. The NLRB Regional Office refused to issue a complaint on this charge, and this refusal was upheld by the NLRB's Office of General Counsel. *Tr.,* pp. 116, 168–69, *Def. Ex. 5.*

On September 10, 2002, Mel–O–Cream, in response to Local 1's request for information, sent Local 1 a list of new hires and temporary employees. *J. Ex. 12.* Mel–O–Cream also reiterated its position that it considered the newly hired employees to be permanent replacements, despite the union's contention that the replacement workers should be displaced by striking employees when the union returned to work. *J. Ex. 13.* Mel–O–Cream also stated that the union had not made an unconditional offer to return to work, and when it did, the return of striking workers would be contingent on the existence of vacant positions and the Company's needs. *Id.*

On September 19, 2002, Head sent a letter to Ryan which stated: "The purpose of this letter is to officially notify you that the Union is accepting Mel–O–Cream's final offer of July 4, 2002." *J. Ex. 14.* In a separate letter, also dated September 19, 2002, Head stated: "all striking employees will be returning to work effective Sunday, September 22, 2002." *J. Ex. 15.* In a letter dated September 20, 2002, Braskich informed Head that:

> We will send you in the near future a cover-to-cover copy of the new labor agreement for signature.
>
> With respect to the ending of the strike, striking employees will not be permitted to return to work on September 22, 2002. As the Company has previously stated, the Company considers the replacement employees to be permanent replacements.

*J. Ex. 16.*

On September 24, 2002, representatives of Mel–O–Cream and Local 1 met to discuss the return of striking workers. Mel–O–Cream stated its position was that striking employees were not "laid off"; the striking employees would be reinstated when vacancies arose, and the employees hired during the strike were permanent replacements. *Pretrial Order,* ¶¶ 29, 30, *Tr.* p. 66–67.

Also on September 24, 2002, Local 1 presented Mel–O–Cream with a draft of the proposed new labor contract which contained language in § 9.5 which had not been included in Mel–O–Cream's final offer. Section 9.5 in Local 1's proposal read as follows:

(a) The Employer hereby agrees to be bound as a party by all the terms and provisions of the Agreement and Declaration of Trust dated September 11, 1955, as amended, establishing the Bakery and Confectionery Union and Industry International Pension Fund (hereinafter called the Fund) and said Agreement is made part hereof by reference.

(b) Commencing with the 1st day of the first month following ratification of the 2002–2005 labor agreement, the Employer agrees to make payments to the Bakery and Confectionery Union and Industry International Pension Fund for each employee working in job classification covered by the said Collective Bargaining Agreement as follows:

For each hour or portion thereof, for which an employee, subject to the Collective Bargaining Agreement, receives pay, the Employer shall make a contribution of $12.36 per day to the above-named Pension Fund, up to a maximum of 5 days in any week.

For the purpose of this Article, it is understood that contributions shall be payable on behalf of employees from the first day of employment, whether said employees are permanent, temporary, or seasonal, or fulltime or part-time employees, and regardless of whether or not they are members of the Union. The term 'employee' does not include a selfemployed person, corporate officer, owner, or partner.

*J. Ex. 17,* § 9.5.[2] Head does not remember discussing § 9.5 at the September 24 meeting. *Tr.,* p. 49.

Ryan testified that Mel–O–Cream had not bargained for the language in § 9.5 that its liability for pension contributions would be triggered by an employee's work for "each hour or portion thereof." *Tr.,* p. 127. Such language "had the potential to have a significant impact on [Mel–O–Cream's] costs." *Id.* Further, Ryan stated that under Local 1's version of § 9.5, the definition of "employee" was ambiguous, in that it might include individuals outside the bargaining unit. *Id.* at 131.

Braskich also testified that Mel–O–Cream never agreed to Local 1's version of § 9.5. *Tr.,* p. 149. Section 9.5(a) would bind Mel–O–Cream to a separate trust agreement, exposing the company to an open ended possibility of revision to its obligations. *Id.* at 150. Further, Braskich claimed the "hour or portion thereof" language could mean that even if an employee worked for fifteen minutes, Mel–O–Cream would be required to pay the daily pension obligation. *Id.* at 151. Braskich also was concerned that Local 1's definition of employee could include a manager or supervisor. *Id.* at 153. If the manager or supervisor happened to be performing work of a bargaining unit employee, then under Local 1's version of § 9.5, Mel–O–Cream might be required in that instance to make the pension contribution for that supervisor. *Id.*

Head testified that Local 1's version of § 9.5 "is just boilerplate language, pension plan language, that's all it is. And nothing that we put in here supercedes any trust rules. So this is just basically boilerplate language that we used." *Id.,* p. 24. According to Head, the rules of the B & C Industrial Trust Fund controlled, and all Local 1 could do was to negotiate levels and different plans or benefits. *Id.* Head

**2.** In Mel–O–Cream's final offer, § 9.5 read as follows: "Effective the first month following ratification of the 2002–2005 labor agreement, the Company will commence contributions to the B & C Pension Fund at the 925 Benefit Level ($12.36 per day per covered employee), with a maximum contribution of $61.80 per week per covered employee." *J. Ex. 5,* § 9.5.

discussed with Mel–O–Cream's representatives the need for this boilerplate language before the strike began in July. *Id.* Head also testified that the provision "hour or portion thereof" language was mistakenly inserted in Local 1's draft. *Id.* at 50, 182. Head obtained this language from a model agreement that had an hourly instead of daily contribution rate, and he forgot to adjust the "hour or portion thereof" language. *Id.* at 47, 182.

On September 27, 2002, Local 1 filed four Grievances numbered 117, 119, 122 and 123. Grievance 117 alleged that Mel–O–Cream violated the discrimination (§ 1.6) and lay-off and rehire provisions (§ 3.3) of the CBA. *J. Ex. 18.* Grievance 119 alleged violations of the discrimination, seniority date (§ 3.1), and filling of vacancies provisions of the CBA (§ 3.2). *J. Ex. 19.* Grievance 122 alleged violations of the discrimination, seniority date, filling of vacancies and lay-off and rehire provisions of the CBA. *J. Ex. 20.* Grievance 123 alleged violations of the discrimination, seniority date, filling of vacancies and the lay-off and rehire provisions of the CBA. *J. Ex. 21.* On October 4, 2002, Mel–O–Cream denied these grievances on the ground that they were not arbitrable because the issues raised were pre-empted by the National Labor Relations Act (NLRA). *J. Exs. 24–27.* Mel–O–Cream also claimed that the non-reinstated, striking employees were not laid off, so recall rights did not apply. *J. Ex. 25.*

In a letter dated October 8, 2002, Mel–O–Cream expressed its concerns regarding Local 1's version of § 9.5. "First, the parties never agreed to the language in subsection (a). Second, enclosed is suggested revised language for subsection (b). These changes are based upon the language contained in the Pension Fund Rules and Regulations." *J. Ex. 30.*

Local 1 responded in a letter dated October 11, 2002. Head stated that at Mel–O–Cream's request, he had changed the language in Section 9.5. *J. Ex. 31.* Despite agreeing to the changes, Head stated:

... I wanted to make sure that the Company understood that regardless of what language is in the CBA the Rules and Regulation of the B & C Industry Pension Fund (the Fund) supersedes any contract language. The Fund is a Taft Hartley Trust and can be changed from time to time by action of the Trustees.

*Id.* In the final, signed version of the CBA, § 9.5 reads as follows:

(a) Commencing with the 1st day of the first month following ratification of the 2002–2005 labor agreement, the Employer agrees to make payments to the Bakery and Confectionery Union and Industry International Pension Fund for each employee working in a job classification covered by the said Collective Bargaining Agreement as follows:

(b) For each day in which an employee, subject to the Collective Bargaining Agreement, receives one (1) hour's pay, the Employer shall make a contribution of $12.36 per day to the above-named Pension Fund, up to a maximum of five (5) days in any week.

For the purpose of this Article, it is understood that contributions shall be payable on behalf of employees from the first day of employment.... The term 'employee' does not include a self-employed person, corporate officer, owner, or partner or any person who exercises management authority for the Employer.

*J. Ex. 43,* § 9.5.

Also on October 11, 2002, Local 1 filed Grievance Nos. 124 and 125. *J. Exs. 32, 33.* Grievance No. 124 alleged that Mel–O–Cream violated the discrimination (§ 1.6) and welfare insurance provisions

(§ 8.1) of the CBA. *J. Ex. 32.* Local 1 demanded the company provide insurance coverage for all laid off employees as required by the CBA. *Id.* Grievance No. 125 alleged that Mel–O–Cream violated the discrimination (§ 1.6) and layoff and rehire provisions (§ 3.3). *J. Ex. 33.* Local 1 demanded the company comply with the CBA by recalling laid off employees instead of using temporary workers. *Id.* Mel–O–Cream denied these grievances because they were preempted by the NLRA, the grieving employees were not laid off by the company, and the grievances were untimely. *J. Exs. 37, 38.*

In an October 15, 2002, letter, Braskich noted that Local 1's position of October 8, 2002, that all bargaining unit employees should be entitled to bid on open positions, contradicted Local 1's position of September 24, 2002, which was that nonreinstated employees should be excluded from the bidding process. *J. Ex. 34.* On October 17, 2002, Local 1 informed Braskich that the union, without waiving its position regarding return to work issues, agreed that the best way to fill vacancies is to recall laid off/non-reinstated employees by seniority. *J. Ex. 35.* On October 18, 2002, Braskich sent a letter to Head proposing the following:

> Notwithstanding the parties' positions, and without a waiver of those positions, the parties have agreed that with respect to the filling of vacancies, the non-reinstated employees will be offered vacant positions, both full-time and part-time, on the basis of seniority. The parties have further agreed that the filling of vacancies through the bidding procedures set forth in Section 3.2 of the labor agreement will be suspended until all non-reinstated employees have been offered vacant full-time positions. Stated differently, any vacant full-time or part-time positions will be offered to non-reinstated employees, rather than filling those vacancies through the bid-

ding procedures of the labor contract. The parties have further agreed that full-time employees may refuse part-time positions without loss of reinstatement rights to vacant full-time positions. Inasmuch as this process will override Section 3.2, please acknowledge the Union's agreement on this issue by signing and dating:

*J. Ex. 36.* Head signed this acknowledgment and dated it October 18, 2002. *Id.*, Tr., pp. 68–69.

The final version of the CBA was signed by Mel–O–Cream's representative on November 5, 2002, and by Local 1's representatives on November 6, 2002. *J. Ex. 43.* The signed agreement states that, "This AGREEMENT made and entered into this *19th* day of *SEPTEMBER*, 2002 . . . ." *Id.* The month and day were handwritten into the agreement, and it is undisputed that this date was filled in by Local 1 without discussion or notification to Mel–O–Cream. *Pretrial Order*, p. 8, ¶ 46. It is undisputed that the agreement signed in November 2002, and Mel–O–Cream's final offer, contain identical grievance arbitration provisions which provide for final and binding arbitration of grievances. *Id.* p. 8, ¶ 48.

Local 1 continued to seek arbitration of the grievances, and in December 10, 2002, Mel–O–Cream took the position that the grievances were not arbitrable since the agreement was not signed by both parties until November 6, 2002, and the grievances were filed during a time when the agreement was not in effect. *Id.*, ¶ 52, *J. Ex. 46.* Mel–O–Cream informed Local 1 that if it wished to proceed with the grievances, the proper forum to determine arbitrability is a declaratory judgment action in federal court. *J. Ex. 46.* On December 23, 2002, Local 1 brought this action.

*ANALYSIS*

Section 301 of the LMRA provides that this Court has jurisdiction to hear "[s]uits

for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce...." 29 U.S.C. § 185(a). Section 301 gives this Court jurisdiction to hear suits over the existence and validity of labor contracts. *International Brotherhood of Electrical Workers, Local 481 v. Sign–Craft, Inc.,* 864 F.2d 499, 502 (7th Cir.1988). "Section 301 is more than just a grant of jurisdiction to the federal courts; it 'authorizes federal courts to fashion a body of federal law for the enforcement of ... collective bargaining agreements....'" *Id. citing Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In this case, the issue is the point at which the new CBA came into effect and whether the grievances were filed when the new CBA was in effect. Once the CBA came into effect, the parties were subject to the grievance arbitration provisions of this CBA, and under § 301, this Court can direct the parties to submit the grievances to arbitration.

■ While strict rules of contract interpretation do not necessarily control all decisions in labor-management cases, "the normal rules of offer and acceptance are generally determinative of the existence of a collective bargaining agreement." *Capitol–Husting Company, Inc. v. National Labor Relations Board,* 671 F.2d 237, 242 (7th Cir.1982). However, the "more crucial inquiry is whether the two sides have reached an 'agreement,' even though that 'agreement' might fall short of the technical requirements of an accepted contract." *Id. quoting National Labor Relations Board v. Donkin's Inn., Inc.,* 532 F.2d 138, 141 (9th Cir.1976). "[I]t is well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound. All that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." *Id.* at 243 (inter-

nal citations omitted). If the parties' conduct demonstrates a meeting of the minds as to the agreement, then an agreement has been formed, even if it is not yet reduced to writing. *Mack Trucks, Inc. v. International Union, United Auto, Aerospace and Agricultural Implement Workers of America, UAW,* 856 F.2d 579, 589–590 (3d Cir.1988).

1. *Mel–O–Cream's discontinuance of the arbitration provision until signature of the agreement does not alter or amend its final offer*

■ Mel–O–Cream's final offer of July 4, 2002, contained a grievance and arbitration provision. However, after the strike commenced, Mel–O–Cream informed Local 1 on July 8, 2002, that it was discontinuing the arbitration, dues check-off and securities provision, and those provisions would become effective once the new agreement was *signed.* Initially the Court must determine whether Mel–O–Cream's July 8th letter was a modification of its last and final offer.

The Court finds that this letter does not constitute a modification or amendment of Mel–O–Cream's final offer. Rather this letter informed Local 1 that Mel–O–Cream had the right to discontinue these provisions after the old agreement had expired. *See The Hilton–Davis Chemical Co.,* 1970 WL 25333, 185 NLRB 241, 242 (1970) (company not required to submit grievances to arbitration during the period between expiration of one agreement and the reaching of a new one); *Bethlehem Steel Co.,* 1962 WL 16787, 136 NLRB 1500, 1502 (1962) (company not required to implement dues checkoff or union security provisions following termination of agreement). Further, on July 16, 2002, Mel–O–Cream informed Local 1 that: "On July 4, 2002, the Company presented the Union with its last and final offer.... It is our position that

the parties are at an impasse. Please be advised that the Company intends to implement its last and final offer at 10:00 p.m. on July 21, 2002." *J. Ex. 7.* Mel–O–Cream did not refer to any amendments to its last and final offer, but rather it announced it was implementing its last and final offer of July 4, 2002. Thus, Mel–O–Cream's July 16th letter made clear that its July 8th letter was not an amendment to its last and final offer of July 4th.

Next, the Court must determine whether the reference by Mel–O–Cream in the July 8th letter that arbitration, dues checkoff and securities provisions would not be effective until a new contract was *signed* evidenced an intent not to be bound until that point or merely referenced a point at which any agreement reached would be memorialized in writing. Despite the reference to a contract not becoming effective until *signed,* the parties' conduct evidenced that they intended to be bound before that point.

The new CBA was signed by the parties on November 5–6, 2002. Nevertheless, the parties signed a side-agreement on October 18, 2002, agreeing that the bidding procedures in § 3.2 "will be *suspended* until all non-reinstated employees have been offered vacant full-time positions.... Inasmuch as this process will override Section 3.2, please acknowledge the Union's agreement on this issue...." *J. Ex. 36* (emphasis added). The Court finds that the parties agreement to "suspend" a section of the CBA was an acknowledgment by the parties that a CBA was already in existence, even though it had not yet been signed.

Therefore, the Court finds that on July 21, 2002, Mel–O–Cream implemented its last and final offer of July 4, 2002. That offer also contained a grievance arbitration provision. *See Pretrial Order,* ¶ 48. The Court finds that if the parties manifested an intent to be bound by the agreement,

prior to when the agreement was signed, a CBA was formed, regardless of Mel–O–Cream's statement that it would discontinue the arbitration provision until the agreement was signed. Mel–O–Cream's letter of July 8, 2002, does not alter or amend its final offer, nor does it show an intention not to be bound by an agreement once reached. The key issue is the date on which the parties manifested their agreement on a new CBA and their intent to be bound, not the date the CBA was signed.

2. *The disputes over § 9.5 prevented a meeting of the minds until those disputes were resolved*

■ On September 19, 2002, Local 1 stated that it was accepting Mel–O–Cream's final offer. However, on September 24, 2002, Local 1 submitted its proposed version of the contract, which contained significantly different language in § 9.5. Under Local 1's terms, § 9.5 would have exposed Mel–O–Cream to liability for pension contributions on terms that Mel–O–Cream had not bargained for and on terms which it deemed unacceptable. Arguably, Mel–O–Cream could have been be required to make pension contributions for supervisors and managers who might occasionally perform bargaining unit functions. Further, under Local 1's version, Mel–O–Cream would be required to make pension contributions for "each hour or portion thereof" that an employee is paid. Mel–O–Cream interpreted this language to mean that it would be required to make the daily contribution even if an employee worked less than one hour. This potential exposure was unacceptable to Mel–O–Cream, and it insisted the language be revised. *See J. Ex. 30, Tr.,* 149–53.

"[A]s a general matter, 'a contract does not arise if the union and management have not resolved a dispute over a substan-

tive term.'" *Mack Trucks, Inc.*, 856 F.2d at 593 (internal quotations omitted). The Court finds the language in Local 1's version of § 9.5, to which Mel–O–Cream objected, was substantive since it exposed Mel–O–Cream to greater liability for pension contributions than for which it had bargained. Head testified that the inclusion of this language was just a "mistake." However, this "mistake" would have exposed Mel–O–Cream to unbargained for pension liability. Even if Head's submission of this language was only a mistake, Mel–O–Cream had no reason to know that. The differences in the language were substantial enough to prevent a meeting of the minds; the Union did not withdraw its § 9.5 until after Mel–O–Cream objected to it. Therefore, the Court finds that when Local 1 submitted its contract proposal on September 24, 2002, it did not show an intention to be bound to Mel–O–Cream's final offer, due to these differences in the language of § 9.5.[3]

On October 11, 2002, Head agreed to Mel–O–Cream's request to change the language of § 9.5. The Court finds that on that date there were no further disagreements over any substantive terms of the CBA, and the parties manifested an intention to be bound by the CBA. Therefore, the Court finds that the CBA was formed on October 11, 2002. That CBA contained a grievance arbitration provision. The Court also finds that the grievances filed October 11, 2002, were filed contemporaneously to the formation of the CBA. Therefore, the grievances filed October 11, 2002, are arbitrable. Further, the Court finds

that an implied-in-fact interim agreement was not formed prior to October 11, 2002, since the parties' actions did not create such an agreement.

3. *The dispute over status of striking and replacement workers, and dispute over interpretation of § 3.2, did not prevent the formation of a CBA on October 11, 2002*

■ Throughout the parties' negotiations during the strike, after the strike, and even after the CBA was signed, the parties continued to disagree over the status of the striking workers and the replacements who were hired during the strike. Local 1 claimed that the workers should be recalled and displace the replacement workers. Mel–O–Cream took the position that the striking workers could not displace the new workers since they were "permanent" replacements. Mel–O–Cream argued that since the striking employees were not "laid-off," the layoff and rehire provisions of the CBA did not apply; instead, the striking employees would be rehired as vacancies arose. *See J. Exs. 16 and 34.* On October 18, 2002, without waiving their positions, the parties agreed that the bidding procedures set forth in § 3.2 would be suspended until all non-reinstated employees were offered vacant full-time positions. *J. Ex. 37.* However, the disagreement over the status of the striking workers remains unresolved; Head testified at trial, "I'm not sure that it was ever resolved." *Tr.* p. 67.

---

**3.** Mel–O–Cream also claims that § 9.5(a) of Local 1's proposal would incorporate a trust agreement to which Mel–O–Cream was not a party. Local 1 claims that the rules of the trust controlled regardless of whether it was in the CBA. *Tr.,* p. 24, *J. Ex. 31.* The parties have not presented the trust agreement to the Court, and accordingly the Court expresses no opinion on whether Mel–O–Cream would

be bound by such an agreement if it were not incorporated into the CBA. In any event, the Court finds that the differences in Local 1's § 9.5 language regarding the hourly/daily contribution rules and the definition of "employees" are substantial enough so as to prevent an intention to be bound until Local 1 agreed to Mel–O–Cream's requests to amend § 9.5 on October 11, 2002.

The disagreements over the status of the striking workers and interpretation of § 3.2 do not involve the inclusion or omission of a particular term or language in the agreement. Rather, the differing positions involve interpretation of a contract term and how to classify the two groups of workers. Since such differences go only to the issue of contract interpretation, and not the inclusion of a substantive term, the Court finds that these differences did not affect the parties' intention to be bound by the terms of the CBA as of October 11, 2002.

Additionally, as stated above, the October 18, 2002, side-agreement provided that the bidding procedures in § 3.2 "will be suspended"; this is an acknowledgment by the parties that the CBA was in effect. *J. Ex. 36.* Further, as Head testified, the disagreement over the status of striking workers remains unresolved to this day, yet neither party takes the position that currently there is no CBA in effect.

## CONCLUSION

The Court finds that a Collective Bargaining Agreement was formed on October 11, 2002. On that date, the parties manifested their intention to be bound. That Collective Bargaining Agreement contained a grievance arbitration provision identical to the arbitration provision in the contract signed in November 2002. There was no Collective Bargaining Agreement formed, nor implied-in-fact interim agreement created, before that date. The two grievances filed on October 11, 2002, were filed contemporaneously with the formation of the Collective Bargaining Agreement, and are arbitrable. The four grievances filed before October 11, 2002, are not arbitrable since no agreement or implied-in-fact interim agreement was in effect on the date they were filed. Since the grievances filed before October 11, 2002, allege violations of a Collective Bargaining Agreement at a time when no agreement

was in effect, the Court has no authority under § 301 to decide these grievances on their merits.

THEREFORE, on Count I of the Complaint, the Court enters judgment in favor of Plaintiff Local 1 and against Defendant Mel–O–Cream as to Grievance Numbers 124 and 125. The Court orders that these two grievances be submitted to arbitration. Also on Count I of the Complaint, the Court enters judgment in favor of Defendant Mel–O–Cream and against Plaintiff Local 1 as to Grievance Numbers 117, 119, 122 and 123. These four grievances are not arbitrable. Since there was no implied-in-fact interim agreement created before October 11, 2002, and since a Collective Bargaining Agreement was not formed until October 11, 2002, the Court enters judgment in favor of Mel–O–Cream and against Local 1 on Count II of the Complaint. This case is closed.

IT IS THEREFORE SO ORDERED.