In re Marc William DITTMAR, Debtor.

Linda S. Parks, Trustee, Appellant,

v.

Marc William Dittmar, Appellee.

In re Patricia A. Little, Debtor.

Linda S. Parks, Trustee, Appellant,

v.

Patricia A. Little, Appellee.

In re Larry E. Letourneau and Donna
M. Letourneau, Debtors.

Linda S. Parks, Trustee, Appellant,

v.

Larry E. Letourneau and Donna
M. Letourneau, Appellees.

In re Forest Earl Denton and
Germaine Ann Denton,
Debtors.

Linda S. Parks, Trustee, Appellant,

v.

Forest Earl Denton and Germaine
Ann Denton, Appellees.

In re John Earl Hulse, Debtor.

Linda S. Parks, Trustee, Appellant,

v.

John Earl Hulse, Appellee.

In re Ricky A. Murphy and Denise
L. Murphy, Debtors.

Linda S. Parks, Trustee, Appellant,

v.

Ricky A. Murphy and Denise
L. Murphy, Appellees.

In re Cynthia My Nguyen, Debtor.

Linda S. Parks, Trustee, Appellant,

v.

Cynthia My Nguyen, Appellee.

In re Michael E. Lowe and Jacqueline
E. Flowers–Lowe, Debtors.

Carl B. Davis, Trustee, Appellant,

v.

Michael E. Lowe and Jacqueline
E. Flowers–Lowe, Appellees.

BAP Nos. KS–08–002, KS–08–003, KS–
08–004, KS–08–005, KS–08–006, KS–
08–007, KS–08–008, KS–08–009.
Bankruptcy Nos. 05–17094, 05–15334,
05–15333, 05–16951, 05–17430, 05–
15728, 05–16484, 05–14936.

United States Bankruptcy Appellate Panel
for the Tenth Circuit.

July 13, 2009.

Gaye B. Tibbets of Hite, Fanning & Honeyman, L.L.P., Wichita, KS, for Appellant Linda S. Parks, Trustee.

Don W. Riley, Wichita, Kansas, for Appellee Marc William Dittmar.

Submitted on the briefs (KS–08–003, KS–08–004, KS–08–005, KS–08–006, KS–08–007, KS–08–008, and KS–08–009): David J. Lund of Dewey & Lund LLP, Wichita, Kansas, for Appellees Patricia A. Little, Forest E. Denton, and Germaine A. Denton.

Michael J. Studtmann of Michael J. Studtmann, P.A., Wichita, KS, for Appellees Larry E. Letourneau and Donna M. Letourneau.

David L. Hiebert (on the briefs) of Gragert, Hiebert, Gray & Link, Wichita, KS, for Appellee John Earl Hulse.

Carl B. Davis and Mark D. Kiefer (on the briefs) of Davis & Jack, L.L.C., Wichita, KS, for Appellant Carl B. Davis, Trustee.

Ryan E. Hodge and Elaine F. Winter (on the briefs) of Ray Hodge & Associates, L.L.C., Wichita, KS, for Appellees Michael E. Lowe and Jacqueline E. Flowers–Lowe.

Before BOHANON, BROWN, and WEAVER [1], Bankruptcy Judges.

## OPINION

BOHANON, Bankruptcy Judge.

Appellants Linda S. Parks and Carl B. Davis ("the Trustees") appeal the bankruptcy court's summary judgment order holding that post-petition cash and stock distributions received by the debtors through their employment are not property of the debtors' estates under 11 U.S.C.

---

1. Honorable Thomas Michael Weaver, United States Bankruptcy Judge, United States Bankruptcy Court for the Western District of Oklahoma, sitting by designation.

§ 541.[2] For the following reasons, we AF-FIRM.

## I. Jurisdiction

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[3] The bankruptcy court's judgment is a final order subject to appeal under 28 U.S.C. § 158(a)(1). The Appellants timely filed their notices of appeal.[4] No party elected to have this appeal heard by the United States District Court for the District of Kansas, thus consenting to review by this Court.

## II. Standard of Review

■ We review *de novo* the bankruptcy court's legal determination that the post-petition distributions were not property of the Debtors' estates under 11 U.S.C. § 541.[5]

## III. The Facts and the Bankruptcy Court's Holding

The complete facts underlying this appeal are fully set out in the bankruptcy court's detailed Findings of Fact and Conclusions of Law and will not be repeated here except as necessary to discuss the legal arguments on appeal.[6]

Debtors are former employees of The Boeing Company ("Boeing") who became employees of Spirit Aerosystems, Inc. ("Spirit") on June 17, 2005, the date Spirit acquired Boeing's Wichita plant. At the time of the sale, Debtors' Unions ratified a collective bargaining agreement ("CBA") with Spirit.[7] Under the CBA, Spirit agreed to establish an equity participation program ("EPP") for union-represented employees, and contribute stock appreciation rights to the program. Upon the occurrence of certain events, certain employees were eligible to receive distributions under the anticipated, but not yet formed EPP.

While each Debtor has a different filing date, each of the Debtors filed their bankruptcy cases before October 17, 2005, after the CBA was ratified, but before the EPP was created.[8]

On October 27, 2006, Spirit created the EPP and issued stock appreciation rights ("SARS") to vest upon an initial public offering ("IPO") or other defined trigger-

---

**2.** Carl B. Davis is the trustee in BAP Case No. KS–08–009. Linda S. Parks is the trustee in the remaining cases. For ease of reference in this opinion, any position jointly shared by trustee Linda Parks and trustee Carl Davis shall be referred to as "the Trustees." The debtors in all the appeals are referred to as "the Debtors." References to "Unions" are to the International Association of Machinists and Aerospace Workers ("IAM") or the International Brotherhood of Electrical Workers ("IBEW"); one or the other represented the debtors during negotiations with their employer. The Appendix submitted in BAP No. KS–08–009 will be referred as "Davis Appx." The Appendices submitted in BAP No. KS–002 through –008 will be referred as "Parks Appx."

**3.** 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

**4.** Fed. R. Bankr.P. 8002(a).

**5.** *In re Wise*, 346 F.3d 1239, 1241 (10th Cir. BAP 2003).

**6.** *In re Lowe*, 380 B.R. 251 (Bankr.D.Kan. 2007).

**7.** Two CBAs were ratified, one by the IAM and the other by the IBEW. Since they are substantively identical, for ease of reference, they will be referred in the singular as the "CBA."

**8.** October 17, 2005 is the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

ing event. The EPP identified which employees were eligible to participate in the EPP:

> The employees who are eligible to participate in the Plan are those hourly employees of Spirit who (a) are represented by one of the Unions or were represented by one of the Unions while employed by Spirit, (b) are former employees of The Boeing Company who either (I) became employed by Spirit on the day after the Closing Date, or (ii) were on an approved leave of absence on the Closing Date and became employed by Spirit immediately upon conclusion of such leave, and (c) were employed by Spirit for at least ninety (90) consecutive days during the period commencing on the day after the Closing Date, and ending on December 31, 2005.[9]

On November 27, 2006, Spirit completed the IPO and the employees' rights to the SARS vested. Distributions were made to the debtors in December 2006, and March 2007. Debtors received a cash distribution of $34,556 around December 6, 2006, and 1,034 shares of Spirit Class A common stock around March 15, 2007.

Following Spirit's payment of distributions to Debtors, the Trustees filed motions for turnover of all distributions received from Spirit, contending they were property of the estates under 11 U.S.C. § 541.[10] The Debtors objected, and, after a hearing, the bankruptcy court entered an interim order denying turnover of the distributions.[11] A pretrial order followed. After discovery, various parties filed motions for summary judgment on the Trustees' motions for turnover of the distributions.

On December 24, 2007, the bankruptcy court issued a memorandum opinion (the "Appealed Order") granting Debtors' motion for summary judgment and denying the trustees' motion, finding the distributions were not property of the bankruptcy estate.[12] The bankruptcy court, relying upon Kansas state law, held that the CBA did not grant the Debtors an enforceable right in the distribution because it did not clearly define which employees would have rights under the EPP. The term "participating employees" was not defined until the post-petition creation of the EPP in October 2006. Thus, until the EPP was created, an enforceable right to the SARS did not exist. As a result, the bankruptcy court concluded the rights to the distributions were not property of the estate because there was no prepetition document or agreement establishing that these Debtors would qualify as participating or eligible employees having a contingent, future interest under the EPP.

## IV. Discussion

The Trustees claim that the bankruptcy court erred in concluding that the Debtors' rights to the SARS are not property of the estate under § 541. The gist of the Trustees' appeal is that the bankruptcy court erroneously applied state contract law in construing the CBA, and disregarded federal collective bargaining law that recognizes and enforces oral agreements at the bargaining table. The Trustees claim that the parties to the CBA had orally agreed

---

9. *EPP* at 3, § 3.01, *in* Davis Appx. at 57.

10. Unless otherwise noted, all future statutory references are to Title 11 of the Federal Bankruptcy Reform Act of 1978.

11. *Interim Order on Chapter 7 Trustees' Motions for Turnover of Spirit Aerosystems' Distri-*

butions *to Debtors Made Under Equity Participation Program ("Interim Order"), in* Davis Appx. at 63–78.

12. *In re Lowe*, 380 B.R. 251 (Bankr.D.Kan. 2007).

at the bargaining table which employees were eligible to receive the distributions in June 2005.

The bankruptcy court's analysis was based on its belief that Kansas law requires the Debtors to be expressly identified as third-party beneficiaries in order to enforce a provision of the CBA. Because the Debtors' interest in the property must exist as of the commencement of the case, the bankruptcy court focused its attention on which agreement clearly expressed these Debtors would qualify as participating employees. The bankruptcy court's analysis is flawed for two reasons. First, the bankruptcy court's reliance on the Kansas *Stovall* case is misplaced.[13] *Stovall* is distinguishable because it does not involve a CBA. Second, focusing on the issue of who is eligible to receive the distributions presumes that the rights/interests granted under the CBA/EPP are of the kind that may be included in "property of the estate."

We begin our analysis by reviewing the interest granted by the CBA/EPP. Section 541(a)(1) defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." The purpose of § 541(a) is to bring anything of value that the debtors have into the estate. Courts have construed the term "property" broadly and "an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."[14]

State law defines and creates property interests.[15] Once property rights are determined under state law, federal bankruptcy law establishes the extent to which the property interest is property of the bankruptcy estate.[16] A "legal interest" is an interest recognized by law.[17] An "equitable interest" is an interest held by virtue of an equitable title or claimed on equitable grounds, such as the interest held by a trust beneficiary.[18]

The rights at issue are contractually-based, rather than state-created; thus resolution of this case requires interpretation of the CBA and EPP. The determinative issue is whether the Debtors had an enforceable right to the distribution when they filed their respective petitions. A leading treatise provides:

While federal labor law governs the enforcement of collective bargaining agreements, traditional principles of contract law frequently apply. Consequently, the enforcement of collective bargaining agreements is governed by traditional rules governing the enforceability and interpretation of contracts, so long as their application does not conflict with federal labor policy. However, since a "collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts," not all common-law concepts are applied to determine if a contract exists; thus, for example, a stipulation under which an employer agreed to abide by

13. *Lowe,* 380 B.R. at 257 *(citing State ex. rel. Stovall v. Reliance Ins. Co.,* 278 Kan. 777, 107 P.3d 1219, 1230–31 (2005)).

14. *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966).

15. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

16. *In re Wise,* 346 F.3d 1239, 1241–42 (10th Cir.2003).

17. *Black's Law Dictionary* 816 (7th Ed.2001). For example, contracts or agreements are enforceable at law.

18. *Id.*

any collective bargaining agreement between a union and an employers' association was not invalid for lack of consideration.[19]

The basic canons of interpretation of collective bargaining agreements are (1) the writing will be read as a whole, and every part will be interpreted with reference to the whole, (2) the court will if possible give effect to all parts of the instrument, and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable, (3) the court must try to put into concrete form what the intentions of the parties were, not by slavishly following the words but to say what the underlying purpose was as expressed by the language used, and (4) the court should seek to ascertain the meaning of a collective bargaining agreement not only by viewing the language used by the parties to the collective bargaining agreement, but also by considering the parties' past interpretations and practices. In other words, in interpreting a collective bargaining agreement, the fundamental canons of contract interpretation require that a court not only examine the plain language of the contract in the abstract, but that it seek to ascertain and effectuate the parties' intent, as evidenced by the contract's purpose and the surrounding circumstances.[20]

The SARS were first referenced in the CBA. Under both the IAM and IBEW versions of the CBA, Spirit agreed to establish an EPP that would provide for represented employees to participate in profit earned by Spirit on ten percent of its initial common stock upon one of three events: (1) a substantial sale by its investors; (2) a change of control merger; or (3) an initial public offering ("IPO") of the stock. The bankruptcy court interpreted this provision as simply giving these Debtors the hope, anticipation, or expectation that in the event of a triggering event, they would receive a share of the profits, stating:

> First, these cases do not appear to involve stock options. Indeed, eligible employees did not receive an option to be exercised by them; rather, upon the effective date of the EPP appreciation rights were issued. The appreciation rights did not confer upon the eligible employees any ownership of any stock or the right to purchase stock. If and when the IPO yielded a stock price in excess of the threshold price, the appreciation rights would be converted into the right to receive a distribution payable to eligible employees in cash and stock. They had no "option" per se and did not have to take any steps to "exercise" the option.

> Second, and far more important for today's purposes, the record shows that neither the IPO nor the EPP existed at the time these debtors filed their cases. All the debtors had before the EPP was executed on October 27, 2006 was the hope, anticipation, or expectation that in the event of an IPO, they would receive a share of the profits. That is the only "future" or ["]contingent" interest the Court can glean from the CBA terms.

> . . . Here, these debtors' expectations, if any, were based on the possibility or hope that a sale, merger, or IPO might occur during the term of the CBA. The employees had no control whatever over when or if that might occur because the decision to sell, merge, or publicly offer

**19.** 20 Richard A. Lord, *Williston on Contracts,* § 55:54 (4th ed. updated May 2009) (footnotes omitted).

**20.** *Id.* § 55:20.

stock remained entirely within Spirit's discretion.[21]

Because the Debtors' interests were entirely dependent upon the economic decisions of Spirit, the bankruptcy court concluded that such an expectancy did not rise to the level of a legal or equitable interest in property. We agree.[22]

The dispositive characteristic in *Palmer, Sharp, and Chappo* is that under the terms of the bonus plan, payment of the bonus was solely at the employer's discretion. The *Palmer* court concluded that the debtor had no enforceable claim because the employer, as of the date the debtor filed for bankruptcy, could have decided not to pay any bonus at all under the terms of the plan itself. Here, the distribution is conditioned on a sale, merger, or IPO, all of which are occurrences entirely within Spirit's discretion.

Interpreting the CBA as merely granting an expectancy is further supported by the provisions of the EPP. Section 3.01 states:

Notwithstanding anything herein, no individual Eligible Employee shall have any rights with respect to or interest in the Appreciation Rights, or any right to be allocated any portion of any Net Proceeds and no Eligible Employee is assured that he or she will receive an allocation of any Net Proceeds.[23]

Section 3.01 makes clear that eligible employees have no interest in or rights with respect to the benefits even as of the effective date of the EPP, October 27, 2006. In other words, eligible employees were not assured of receiving any distribution, even after the EPP was established and the Appreciation Rights were issued.

Section 4.01 of the EPP provides:

"Effective as of the Effective Date, the Company shall issue Appreciation Rights ... for the benefit of the Eligible Employees. When vested, each Appreciation Right shall be converted into the right to receive a distribution from the Company of an amount equal to the 'Net Proceeds,' if any, attributable to such Right, as determined on the Measurement Date.... The Appreciation Rights shall not confer upon any Eligible Employee (or his or her Beneficiary) any

---

**21.** *Interim Order* at 13–14, *in* Davis Appx. at 75–76 (footnotes omitted).

**22.** *See Vogel v. Palmer (In re Palmer)*, 57 B.R. 332 (Bankr.W.D.Va.1986) (Postpetition year-end bonus paid by debtor's employer was not property of the estate under § 541, where debtor's receipt of bonus was conditioned in part on his employment on date almost six months after filing of petition, debtor had to perform his job satisfactorily to be eligible to receive a bonus at all, and debtor was not entitled to receive bonus until chief executive officer of employer made such a determination.); *Sharp v. Dery*, 253 B.R. 204 (E.D.Mich. 2000) (No portion of employee bonus that Chapter 7 debtor's employer, in exercise of its sole discretion, declared and paid postpetition was included in "property of the estate," where eligibility for bonus was conditioned upon debtor's continued postpetition employment, and debtor had no enforceable claim to

bonus on petition date.); *In re Chappo*, 257 B.R. 852 (E.D.Mich.2001) (Employee bonus which Chapter 7 debtor received postpetition was not one in which he had interest on petition date, so that bonus was not included in "property of the estate," given that employer had reserved right to terminate, modify, or suspend its bonus program at any time and that bonus plan specifically provided that "a Participant will not have any interest in any Award until it is distributed."). *See also* Elizabeth T. Tsai, Annotation, *Effect of Employer's Discretionary Determination, Generally*, 43 A.L.R.3d 503, § 12 (1972 Supp.2009) (collection of cases holding employer's promise to pay a bonus was held not enforceable in view of the employer's reservation of the right to control the rate or amount, or to withhold payment, at his discretion).

**23.** *EPP* at 3, § 3.01, *in* Davis Appx. at 57.

legal or beneficial ownership of any [stock in the company.]"[24]

The Effective Date is defined in the EPP as the date of its execution, October 27, 2006. Thus, Spirit had to issue the Appreciation Rights on that day.

Section 4.07 states the appreciation rights are non-transferable and nonassignable.[25] Section 4.02 states that the Appreciation Rights vest on the Measurement Date.[26] The Measurement Date is defined as the closing date of the IPO, which was November 27, 2006.[27] Pursuant to § 4.01, only when the Appreciation Rights became vested would they be converted into a right to receive a distribution of the net proceeds of the IPO. Thus, an eligible employee, whether under the CBA or the EPP, had no right to receive a distribution until the IPO was completed.

 In summary, even if the bankruptcy court erred in (1) relying upon Kansas contract law to interpret the CBA, (2) finding the CBA unambiguous, and (3) limiting its analysis to the plain language of the CBA, we would affirm the bankruptcy court's conclusion that the Debtors' rights to the SARS are not property of the estate. At the time of the Debtors' filing for bankruptcy, their right to the SARS was merely an expectancy that did not rise to the level of a legal or equitable interest. Until Spirit consummated the IPO, the Debtors had no legal or equitable interest in the SARS distributions. The Debtors were not entitled to receive the distribu-tion until the IPO was completed. When their bankruptcy petitions were filed, they could not have sued to recover the distribution. Accordingly, we AFFIRM on this alternative ground.[28]

## V. Conclusion

Having carefully reviewed the parties' briefs, the record, and applicable law, we AFFIRM for the reasons stated above.

BROWN, Bankruptcy Judge, dissenting.

I respectfully dissent. I believe the appropriate analysis to apply in this case is to determine: (1) whether the Debtors acquired contingent rights to the SARS distributions prepetition under the CBAs; and, if so, (2) whether the distributions were based, at least in part, on the prepetition employment of Debtors. The legal effect of the CBAs, including Debtors' interests thereunder, must be determined in accordance with federal common law governing labor contracts and not state law. Applying that law, I determine the EPP provisions of the CBAs to be ambiguous, thereby creating an issue of fact that should not have been resolved on summary judgment. I would therefore reverse and remand to allow the bankruptcy court to hear extrinsic evidence.

## I. Background

As noted by the majority, the timeline in this case involves two CBAs ratified prepetition by Unions representing Debtors.

24. *Id.* at 3, § 4.01, *in* Davis Appx. at 57.

25. *See Interim Order* at 6, *in* Davis Appx. at 68. The appellate record contains only limited excerpts of the CBA and EPP. Sections 4.02 and 4.07 were not provided to us, but they were mentioned in the Interim Order.

26. *Id.*

27. *Id.*

28. An appellate court is " 'free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.' " *Griess v. Colo.,* 841 F.2d 1042, 1047 (10th Cir.1988) (quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987)); *United States v. Sandoval,* 29 F.3d 537, 542 n. 6 (10th Cir.1994).

In the months leading up to ratification, Spirit engaged in collective bargaining negotiations with the Unions. One of the negotiated items was Spirit's offer to establish the EPP for current Union employees, which would entitle those employees to receive cash or stock in the event Spirit completed an IPO, sale, or merger, subject to certain conditions. The terms of the proposed EPP were described in a slide show presentation prepared by Spirit, to assist the Unions in explaining the terms of the EPP to their members in preparation for the Unions' vote on the proposed CBAs.

By the end of June 2005, both Unions had ratified new CBAs with Spirit. For purposes of these cases, the CBAs were substantially similar and contained provisions obligating Spirit to establish the EPP. The EPP provisions in the CBAs were not detailed, but they laid out the general parameters of the program. The CBA for the IBEW stated:

> The parties agree to establish an equity participation program for IBEW-represented employees of Spirit AeroSystems, Inc., provided the employees are on the active payroll as of June 17, 2005. Stock appreciation rights will be contributed to the program for the select represented bargaining units, representing a profit opportunity on 10% of the initial common stock of Spirit AeroSystems [sic] parent company. The program will be able to distribute [sic] participating employees cash or common stock following a substantial sale by the Onex investors, a change of control merger, or an

initial public offering of the common stock.[1]

The CBA for the IAM stated:

> The parties agree to establish an equity participation program for I.A.M.-represented employees of Spirit Aerosystems, Inc. Stock appreciation rights will be contributed to the program representing a profit opportunity on 10% of the initial common stock of Mid–Western's parent company. The program will be able to distribute to participating employees cash or common stock following a substantial sale by the Onex investors, a change of control merger, or an initial public offering of the common stock.[2]

Shortly after ratification of the CBAs, all of the Debtors filed their respective bankruptcy petitions over a roughly two month period between August and October, 2005. Approximately one year later, on October 26, 2006, Spirit established the "Spirit AeroSystems Holdings, Inc. Union Equity Participation Plan (Initial Public Offering)." The full plan document is not part of the appellate record,[3] but the available excerpt defines those union-represented employees of Spirit that were eligible to participate in the EPP, as well as the "Appreciation Rights" each eligible employee would receive under the EPP.

Following Spirit's payment of distributions to Debtors, Trustees sought turnover of the distributions in each case, arguing the Debtors had contractual rights to the SARS on the date the Unions ratified the CBAs prepetition, thus making Debtors' interests in the SARS and the distributions made thereunder property of the estate. The Debtors opposed turnover, as-

---

1. *CBA* at 50, *in* Parks Appx. at 158.

2. *CBA* at 86, art. 17, *in* Davis Appx. at 55.

3. Although the parties request that this Court construe the terms of both the CBAs and EPP plan document—a task that typically involves review of the entire contract document—the appellate record contains only limited excerpts from the CBAs and EPP plan document.

serting that their interests in the SARS arose postpetition, when Spirit first issued the EPP plan document. In February 2007, the bankruptcy court issued its Interim Order in which it applied the standards for obtaining a preliminary injunction to determine whether the Trustees were entitled to immediate turnover of the distributions.[4] The Interim Order denied turnover, pending a final determination on the matter. After the parties had an opportunity to complete some discovery, one of the Debtors and one of the Trustees filed motions for summary judgment on the turnover issue.

On December 24, 2007, the bankruptcy court entered its final order ("Final Order") denying turnover, granting the Debtor's motion for summary judgment and denying the Trustee's motion for summary judgment. The bankruptcy court's final order concluded that the CBAs did not create any property rights belonging to Debtors because the CBAs do not clearly identify Debtors as third-party beneficiaries. Under Kansas law, the court concluded Debtors could not have enforced any provision of the CBAs.[5] The bankruptcy court also found that no contingent interests existed on Debtors' petition dates because "the SARS were to be granted or contributed pursuant to the EPP"[6] and not the CBAs. Because Spirit executed the EPP plan document postpetition, the court concluded that Debtors had no contingent interests on their respective petition dates.

The bankruptcy court distinguished these cases from the employee benefit cases relied on by the Trustees (e.g., those involving payment of employee stock options and distributions from profit sharing plans), because in all of those cases, the benefit program or contract pursuant to which the debtor-employee received payment was in existence on the petition date.

The majority affirms the bankruptcy court's ruling in the final order, but based on reasoning contained in the bankruptcy court's Interim Order.[7] The majority concludes that the Debtors had no interest in the distributions until Spirit consummated the IPO. The majority states that prior to the IPO, Debtors had only a "hope, anticipation, or expectation" in distributions because those distributions "were entirely dependent upon the economic decisions of Spirit." In other words, because Spirit had "discretion" on whether to enter into a sale, merger, or IPO, the debtors had no prepetition, contingent interest in the distributions.[8]

## II. Standard of Review

The applicable standard of review for orders granting summary judgment is *de novo*, and this Court is required to apply the same legal standard as was used by the bankruptcy court to determine whether either party is entitled to judgment as

---

4. See *Interim Order, in* Davis Appx. at 63–78.

5. *In re Lowe,* 380 B.R. 251, 257 (Bankr. D.Kan.2007) (citing *State ex rel. Stovall v. Reliance Ins. Co.,* 278 Kan. 777, 107 P.3d 1219, 1230–31 (2005) and *Bunnell Farms Co. v. Samuel Gary, Jr. & Assocs.,* 30 Kan.App.2d 739, 47 P.3d 804, 806 (2002)).

6. *Final Order* at 10, *in* Parks Appx. at 271.

7. It is unclear whether the Interim Order is on appeal before this panel. In the Interim

Order, issued before full summary judgment briefing on the issues, the bankruptcy court applied the standards for obtaining a preliminary injunction. Much of the analysis and case law that the bankruptcy court used in the Interim Order to determine the probability of the Trustees "success on the merits" is significantly different, if not absent, from the Final Order.

8. *Majority Opinion,* at 10–11.

a matter of law.[9] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[10] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[11]

Whether property is included in the bankruptcy estate under § 541 is a question of law.[12] Interpretation of an unambiguous contract is a question of law and is subject to *de novo* review on appeal.[13] The initial determination of whether a contract is ambiguous is also a legal conclusion reviewed *de novo*.[14] "Once it is determined that a contract is ambiguous and that its construction depends on extrinsic circumstances, interpretation of the contract becomes a question of fact."[15] "Findings of fact by a district court will not be set aside unless they are clearly erroneous."[16] The question of whether the bankruptcy court failed to consider or give proper weight to relevant evidence is subject to *de novo* review.[17]

## III. Governing Law

The issue of what property interests are included in the estate under § 541 is a matter of federal bankruptcy law.[18] But the nature of a debtor's property interests is usually determined by reference to state law.[19] As the Supreme Court has explained, "[p]roperty interests are created and defined by state law. *Unless some federal interest requires a different result,* there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."[20] When the property interest at issue is created by federal law or is subject to federal regulation, however, federal law rather than state law, may apply to define the nature and extent of the debtor's interest.[21]

**9.** *Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1303 (10th Cir. 2005).

**10.** *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

**11.** Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**12.** *In re Parsons*, 280 F.3d 1185, 1188 (8th Cir.2002).

**13.** *Williamson v. Kay (In re Villa W. Assocs.)*, 146 F.3d 798, 802 (10th Cir.1998); *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir.1992).

**14.** *In re Kaiser Steel Corp.*, 998 F.2d 783, 789 (10th Cir.1993); *Teton Exploration Drilling, Inc. v. Bokum Res. Corp.*, 818 F.2d 1521, 1526 (10th Cir.1987).

**15.** *City of Farmington v. Amoco Gas Co.*, 777 F.2d 554, 560 (10th Cir.1985).

**16.** *Id.*

**17.** *Harvey ex rel. Blankenbaker v. United Transp. Union*, 878 F.2d 1235, 1244 (10th Cir.1989).

**18.** *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Parks v. FIA Card Servs. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir.2008).

**19.** *In re Marshall*, 550 F.3d at 1255.

**20.** *Butner*, 440 U.S. at 55, 99 S.Ct. 914 (emphasis supplied).

**21.** *E.g., In re Schneider*, 864 F.2d 683, 686 (10th Cir.1988) (construing federal regulations defining agricultural crop payment program to determine debtor's interest in crop payments); *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1055–58 (3rd Cir.1993) (concluding federal common law applied to determine debtor's interests in federally regulated natural gas pipeline revenues); *Baer v. Montgomery (In re Montgomery)*, 219 B.R. 913, 917

The bankruptcy court applied state law contract principles in analyzing Debtors' third-party beneficiary rights under the CBAs. I believe this was in error. The Supreme Court has long held that a collective bargaining agreement is more than a traditional common law employment contract. "[I]t is an agreement creating relationships and interests under the federal common law of labor policy."[22] The source of that federal common law is section 301 of the Labor Management Relations Act ("LMRA"), which governs federal jurisdiction over suits alleging violations of collective bargaining agreements.[23] The Supreme Court has interpreted § 301 to do "more than simply confer jurisdiction on federal courts" but also as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts."[24] This mandate requires that federal law be paramount in "the area covered by" § 301.[25] The need for uniformity is particularly important in the labor context to avoid "[t]he possibility that individual contract terms might have different meanings under state and federal law" because such variance "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements."[26]

The Supreme Court has defined the range of claims that fall within the scope of § 301 to include not only disputes over express provisions of a collective bargaining agreement, but also any claim "substantially dependent upon analysis of [a collective-bargaining agreement],"[27] including state law claims which depend upon the meaning of a collective bargaining agreement for their resolution.[28] As expressed by the Court:

"The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law...."[29]

Consequently, a collective bargaining agreement "is not governed by the same principles of interpretation applicable to

(10th Cir. BAP 1998), aff'd, 224 F.3d 1193 (10th Cir.2000) (construing Internal Revenue Code to determine debtors' interests in earned income credits).

22. Bowen v. U.S. Postal Serv., 459 U.S. 212, 220, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). See also United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578–79, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.").

23. 29 U.S.C. § 185(a). See also Int'l Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 855, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987).

24. Hechler, 481 U.S. at 855–56, 107 S.Ct. 2161 (citations omitted).

25. Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

26. Id. at 103–04, 82 S.Ct. 571.

27. Allis–Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

28. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

29. Allis–Chalmers, 471 U.S. at 211.

private contracts."[30] Rather, courts must apply federal common law when construing and interpreting collective bargaining agreements.[31] This federal common law is "grounded in national labor policy,"[32] though courts may draw guidance from traditional state law rules of contract construction to the extent they are compatible with federal labor law policies.[33] "In light of the important federal policy favoring the existence of collective-bargaining agreements, however, contract law may be given a liberal interpretation."[34] Applying these principles, the bankruptcy court should have determined the legal effect of the EPP provision of the CBAs and the Debtors' rights thereunder by reference to federal common law.

## IV. Discussion

### A. Contingent Property Interests Under § 541

Contingent property interests held by a debtor on the petition date become property of the bankruptcy estate. Section 541 defines property of the estate very broadly as "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever located and by whomever held.[35] The Supreme Court, in the seminal case of *Segal v. Rochelle*, held that an interest is not outside the reach of the bankruptcy estate "because it is novel or contingent or because enjoyment must be postponed."[36] Indeed courts have construed § 541 to include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative...."[37] Thus, the estate can include a debtor's contingent right to a future (postpetition) payment, if the debtor has a legally recognizable interest in the payment on the petition date.[38] To be included in the estate, such a contingent property interest must be "sufficiently rooted in the pre-bankruptcy past[.]"[39]

While these general principles governing property of the estate under § 541 generate little controversy, their application varies widely, especially regarding contingent property interests. Given that our legal

30. *Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1352 (9th Cir. 1990). *See also* 20 Richard A. Lord, *Williston on Contracts* § 55.15 (4th ed. updated May 2009) ("[C]ollective bargaining agreements are to a large degree *sui generis.*").

31. *Lingle*, 486 U.S. at 404, 108 S.Ct. 1877.

32. *Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 225, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983).

33. *Int'l Bhd. of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 405 (7th Cir.2002). *See also Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

34. *E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1550 (11th Cir.1988).

35. 11 U.S.C. § 541(a)(1).

36. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). Although Segal interpreted the predecessor to § 541 under the Bankruptcy Act, Congress affirmatively adopted *Segal's* analysis of property when it enacted § 541. *See In re Barowsky*, 946 F.2d 1516, 1519 (10th Cir.1991) (citing to legislative history of 541). *See also Parks v. FIA Card Servs. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir.2008) (stating that the parameters of § 541 are "generously construed; an interest may be property of the estate even if it is novel or contingent") (internal quotation marks omitted).

37. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993).

38. *In re Ryerson*, 739 F.2d 1423, 1425 (9th Cir.1984) ("By including all legal interests without exception, Congress indicated its intention to include all legally recognizable interests although the may be contingent and not subject to possession until some future time.")

39. *Segal*, 382 U.S. at 380, 86 S.Ct. 511.

system recognizes a wide variety of property interests, this diversity of treatment is not surprising.[40] Nevertheless, the varying analyses make it difficult to cull any settled, functional rule for determining when a contingent interest is property of the estate.[41] At best, the case law can be said to exist on a continuum. At one end are contingent property interests that were clearly created and rooted in a debtor's pre-bankruptcy past, such as a prepetition contract that will result in the debtor receiving payments postpetition. At the other end of the spectrum are interests so amorphous, so speculative, or subject to so many contingencies, that courts deem them to be "mere expectancies," rather than existing property interests. Most interests fall in between these two extremes, and often have a mix of characteristics that make it very difficult to ascertain whether the interest has crossed the line from "mere expectancy" to contingent property interest within the scope of § 541.

Such is the case here. The parties do not dispute that, at some point prior to actually receiving cash and stock distributions from their employer, the Debtors had

contingent property interests in those payments. Exactly when and how those contingent property rights arose, however, is sharply disputed. Both sides rely on § 541 cases that involve various types of employee benefits. This body of case law generally addresses some type of employer benefit paid to a debtor-employee postpetition and analyzes whether the debtor-employee had a prepetition, contingent interest in that benefit payment, so as to bring it into the bankruptcy estate.[42]

Like the bankruptcy court, I find no other employee benefit cases with facts exactly like the ones at issue here. Nevertheless, the various employee benefit cases are instructive. As noted by the bankruptcy court, the employee benefit cases hold, on a fairly uniform basis, that a debtor's contingent interest in future payments from his or her employer held on the filing date becomes property of the estate.[43] An underlying principle of these cases is that the contract or employer benefit program entitling the debtor-employee to payment is in existence before the debtor files for bankruptcy.[44] Although the eventual payment to the debtor is usually

---

**40.** *See In re Kedrowski,* 284 B.R. 439, 440 (Bankr.W.D.Wis.2002) (" 'Property,' James Madison once wrote, 'embraces everything to which a man may attach value and have a right.' ").

**41.** *See, e.g.,* George R. Pitts, *Rights to Future Payment as Property of the Estate Under Section 541 of the Bankruptcy Code,* 64 Am. Bankr.L.J. 61 (Winter 1990) (examining different analyses applied by courts in determining whether contingent interests are property of the estate).

**42.** This excludes employee benefits governed by ERISA, which are dealt with elsewhere in the Bankruptcy Code.

**43.** E.g., *In re Booth,* 260 B.R. 281 (6th Cir. BAP 2001) (post-petition profit sharing payment is property of the estate); *In re Edmonds,* 273 B.R. 527 (Bankr.E.D.Mich.2000), aff'd, 263 B.R. 828 (E.D.Mich.2001) (postpeti-

tion profit sharing payment is property of estate); *In re Carlton,* 309 B.R. 67 (Bankr. S.D.Fla.2004) (employee stock options received postpetition are property of the estate). *But see Sharp v. Dery,* 253 B.R. 204 (E.D.Mich.2000) (finding employee bonus paid postpetition was not property of the estate). Of course, earnings from services performed by an individual debtor postpetition are excluded from the estate by § 541(a)(7) (2005).

**44.** *See In re Booth,* 260 B.R. at 284 (existing profit sharing program in collective bargaining agreement); *In re Edmonds,* 273 B.R. at 527–28 (prepetition profit sharing agreement between employer and debtor's union); *In re Carlton,* 309 B.R. at 69 (employer executed four stock option agreements in favor of the debtor prepetition).

contingent on several factors, such as employment for a certain amount of time or profitability of the company, the right to payment is created prepetition with establishment of the contract or program at issue.[45] The scope of § 541 is broad enough to include these contingent rights to payment.[46] This principle is also found in non-employee benefit cases involving contracts.[47]

The employee benefit cases also look at whether the payment is somehow related to, or based on, the debtor's prepetition employment. In other words, courts consider whether the benefit is "sufficiently rooted in the debtor's prepetition past."[48] When the payment is based on the debtor's prepetition activities or employment, it is property of the estate.[49] When the pay-ment is based on both prepetition and postpetition employment or activities, courts often prorate the payment and include only that portion of the payment based on prepetition activities.[50] Depending on the circumstances, proration may also be required by § 541(a)(6), which excludes from the estate any earnings from services performed by an individual debtor postpetition.[51]

There are some employee benefit cases that take a more narrow view of § 541. This line of cases, relied on by the majority, holds that a employee bonus paid to a debtor postpetition is not property of the estate, even if it is based, in part, on prepetition employment.[52] Although the specific facts of these cases vary, each involves an employer with a bonus pro-

**45.** *E.g., In re Edmonds,* 273 B.R. at 528 ("The profit sharing agreement between the UAW and Ford gave [Debtor] an interest in a potential future cash payment, contingent on sufficient profits and Debtor being on the payroll as of December 31st."); *In re Carlton,* 309 B.R. at 72 ("The Debtor's contract rights under the [prepetition] Agreements, whether accrued or contingent, became property of the estate under 11 U.S.C. § 541(a)(1) on the petition date.").

**46.** *See In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993).

**47.** *E.g., In re Schneider,* 864 F.2d 683, 685–86 (10th Cir.1988) (finding debtor's interest in federal crop payments was not property of the estate because debtor did not execute necessary contract with the government until after the petition date); *Hoseman v. Weinschneider,* 277 B.R. 894, 900 (N.D.Ill.2002) ("Thus, in a contract case, there must have been a contract, something that could have been enforced, and assigned or otherwise alienated or levied against.").

**48.** *Segal v. Rochelle,* 382 U.S. 375, 380, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (finding debtor's interest in loss-carryback tax refund to be "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start" that it should be regarded as property of the estate). *See also In re Booth,* 260 B.R. at 288–89 (citing *Segal*); *In re Edmonds,* 273 B.R. at 529 (same).

**49.** *See In re Booth,* 260 B.R. at 290; *In re Edmonds,* 273 B.R. at 529–30.

**50.** *See In re Booth,* 260 B.R. at 290 (finding it appropriate to prorate "so that only that portion of the profit sharing that related to the Debtor's prepetition employment became property of the estate."); *In re Edmonds,* 273 B.R. at 531 (applying § 541(a)(6) to calculate prepetition portion or payment).

**51.** *Compare In re Edmonds,* 273 B.R. at 531 (applying § 541(a)(6)) *with In re Carlton,* 309 B.R. 67, 74–75 (Bankr.S.D.Fla.2004) (finding § 541(a)(6) inapplicable).

**52.** *E.g., Vogel v. Palmer (In re Palmer),* 57 B.R. 332 (Bankr.W.D.Va.1986); *Sharp v. Dery,* 253 B.R. 204 (E.D.Mich.2000); *In re Chappo,* 257 B.R. 852 (E.D.Mich.2001). *But see In re Pettitt,* 2009 WL 1012977 at *2 (Bankr.S.D.Ind. 2009) (finding bonus paid to debtor postpetition but agreed to by employer prepetition to be property of the estate); *Daly v. Soboslai (In re Soboslai),* 263 B.R. 700 (Bankr.D.Conn. 2001) (finding portion of year-end bonus earned prepetition to be property of the estate).

gram, in existence on the debtor's petition date, that gave the employer discretion as to whether to pay the bonus and required the debtor to be employed for some period postpetition. Based on these circumstances, these courts held that a bonus paid postpetition was not property of the estate.[53]

For example, in *In re Sharp*, the court focused on whether the debtor had an "enforceable right" to the bonus on the petition date.[54] Because the debtor's employer still retained discretion to not pay the bonus on the petition date, the court concluded the debtor had no enforceable right to the bonus on that date, thereby excluding the entire bonus payment from the estate.[55] The court also found it important that, to be eligible for the bonus, the debtor had to work for two months postpetition. Because the bonus was "dependent upon the continued services of the debtor subsequent to the petition," the bonus was not property of the estate.[56] Further, although the bonus was apparently based in part on debtor's prepetition services, the court declined to prorate the bonus, finding that proration was not permitted under the plain language of § 541.[57]

Like some other courts, I disagree with the reasoning of *Sharp* and, in any event, would deem it inapplicable to the facts of these cases.[58] First, *Sharp's* requirement that a debtor have an currently "enforceable right" on the petition date seems to be overly broad. As noted by the Sixth Circuit BAP, "[f]ocusing on whether the debtor had an 'enforceable' contract right when the petition was filed would exclude all contingent interests from the bankruptcy estate, because by definition, a contingent interest is not 'enforceable' until the contingency is met."[59] Further, I disagree with the *Sharp* court's refusal to prorate the bonus payment. As a majority of courts have concluded, I believe proration may be appropriate where a benefit payment is based on both pre- and postpetition conduct of the debtor.[60]

More importantly, the key factor in *Sharp was* the discretion of the employer to make the payment and that factor is not present here. As discussed more fully below, Spirit had a binding, contractual obligation to make EPP distributions to employees, upon the occurrence of certain contingencies.[61] Spirit did not have unfet-

---

53. *See Palmer*, 57 B.R. at 333–36; *Sharp*, 253 B.R. at 207–09; *In re Chappo*, 257 B.R. at 854–55.

54. *Sharp*, 253 B.R. at 207.

55. *Id.* (citing *Palmer*, 57 B.R. at 336–37). *See also In re Chappo*, 257 B.R. at 854 (concluding that dispositive characteristic of the bonus plan was that the employer had complete discretion on whether to pay the bonus to debtor).

56. *Sharp*, 253 B.R. at 208 (citing *Palmer*, 57 B.R. at 334).

57. *Id.* at 208–10.

58. *See In re Booth*, 260 B.R. 281, 290 (6th Cir. BAP 2001) (discussing "fundamental problem" with *Sharp's* analysis); *In re Edmonds*, 263 B.R. 828, 831 (E.D.Mich.2001) (concluding that a broad reading of *Sharp* would be "inconsistent with the multitude of cases holding continent interests to be property of the estate in a wide variety of circumstances").

59. *In re Booth*, 260 B.R. at 290.

60. *E.g., In re Booth*, 260 B.R. at 290 (prorating debtor-employee profit sharing payment); *In re Edmonds*, 273 B.R. at 531 (same); *Daly v. Soboslai (In re Soboslai)*, 263 B.R. 700 (Bankr.D.Conn.2001) (prorating year-end bonus); *Allen v. Levey (In re Allen)*, 226 B.R. 857, 867 (Bankr.N.D.Ill.1998) (prorating debtor-employee's stock options).

61. Of course, as discussed below, there is some issue as to when this binding contractual obligation arose.

tered discretion, as the employer did in *Sharp*, on whether to make payments to debtors, even if all other requirements of the benefit program were met. The majority attempts to characterize the EPP distributions as "discretionary" because all of the EPP's triggering events (*i.e.*, sale, merger, or IPO) were "dependent on the economic decisions of Spirit."[62] This so-called discretion, however, does not derogate Spirit's contractual obligation to make the payments if a triggering event occurred.[63] It is that contractual obligation, in my opinion, that is the source of Debtors' property interests.

Thus, I disagree with the majority's conclusion that Debtors' interests in the EPP distributions were "mere expectancies."[64] Rather, considering all of the case law discussed above, I believe the appropriate analysis involves a determination of two factors: (1) whether Debtors' rights to the distributions were created by prepetition contracts—the CBAs; and, if so, (2) whether the distributions were based, at least in part, on the prepetition employment of Debtors. If both these factors are met, then the distributions are "sufficiently rooted in the debtor's prepetition past" so as to be included to some extent in their bankruptcy estates.

## B. EPP Provisions of the CBAs: Binding Contract?

The first issue, then, is to determine whether the EPP provisions of the CBAs constitute binding contracts under which the Debtors had contingent rights. One of the reasons that the bankruptcy court held that Debtors had no rights under the CBAs was because the CBAs did not identify the Debtors as third-party beneficiaries and because the CBAs merely agreed to establish the EPP and did not define who would be "participating employees," a

---

**62.** *Majority Opinion* at 10–11.

**63.** *Cf. In re Kedrowski*, 284 B.R. 439, 447 (Bankr.W.D.Wis.2002) (debtor's right to per capita distribution from Indian tribe of which she was a member is property of estate even though tribe had discretion, based on economic circumstances, on whether to make distribution to tribe).

**64.** I also disagree with the majority's reliance on transfer restrictions and other limiting language in the EPP plan document as proof that the CBAs granted debtors a "mere expectancy." First, the language cited by the majority is in the EPP document and not in the CBAs, so it is, at best, extrinsic evidence of the meaning of the terms in the CBAs. Assuming this extrinsic evidence is admissible, I do not believe it to be persuasive. The EPP provides that the SARS are non-transferable and non-assignable. The effect of such provisions is specifically limited by § 541(c)(1)(A), which states that, subject to certain exceptions not applicable here, "an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law ... that restricts or conditions transfer of such interest by the debtor[.]" The majority also focuses on language in the EPP plan document that provides that "no individual Eligible Employee shall have any rights with respect to or interest in the Appreciation Rights[.]" *Majority Opinion* at 12, (citing *EPP* at 3, § 3.01, *in* Davis Appx. at 57). Courts construing similar language in other contexts have found such language to be ineffective in preventing the property from being included in property of the estate. *See In re Barnes*, 276 F.3d 927, 928 (7th Cir.2002) (finding debtor's liquor license to be property of the estate, despite Government regulation stating that license holder has no property right in license); *In re Cent. Ark. Broad. Co., Inc.*, 170 B.R. 143, 146 (Bankr.E.D.Ark.1994), *aff'd*, 68 F.3d 213 (8th Cir.1995) (finding debtor's broadcasting license was property of estate despite federal regulation prohibiting debtor from owning license); *Conn. Pizza, Inc. v. Bell Atl.Wash., D.C., Inc. (In re Conn. Pizza, Inc.)*, 193 B.R. 217, 226–27 (Bankr.D.Md.1996) (finding debtor's phone number was property of the estate, despite phone company policy which stated customers have no property right in telephone numbers).

key term whose definition was only provided later in the EPP plan document. The bankruptcy court's analysis is problematic because it did not interpret the EPP provisions of the CBAs in the context of federal common law.

### 1. *Third–Party Beneficiary Standing to Enforce EPP Provisions*

The bankruptcy court concluded that Debtors had no contractual rights under the CBAs because the CBAs did not specifically identify them as third-party beneficiaries. The bankruptcy court's conclusion was based on state contract law that requires an intended third-party beneficiary to be "clearly expressed" in a contract.[65] Federal common law, however, has uniformly held that individual union members are third-party beneficiaries of a collective bargaining agreement, with the right to bring an action for breach of that agreement, even though not specifically named as beneficiaries in the CBA.[66] This is so because the rights of employees are "a major focus of the negotiation and administration of collective bargaining con-

tracts."[67] The Supreme Court has imposed a standing requirement for such suits, which permits individual employees to bring suit only when they assert " 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge."[68] In contrast, an individual employee lacks standing to enforce a collective right held by all union members. The union is the proper party to enforce the collective rights.[69] Such collective rights include, for example, contractual duties to renegotiate a new collective bargaining agreement or the procedures for the relocation of a plant.[70]

In these cases, the EPP provisions concern an employee benefit granted to individual employees, rather than a collective right possessed by the bargaining unit as a whole. Although the EPP does not technically concern wages, Spirit apparently offered to establish the EPP, in part, to offset the ten percent wage cut imposed on union workers by the CBAs.[71] In any event, employee benefits are considered "uniquely personal" and, therefore, enforceable by individual employ-

---

65. *In re Lowe*, 380 B.R. 251, 257 (Bankr. D.Kan.2007) (citing *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 107 P.3d 1219, 1230–31 (2005) and *Bunnell Farms Co. v. Samuel Gary, Jr. & Assocs.*, 30 Kan.App.2d 739, 47 P.3d 804, 806 (2002)).

66. *Int'l Bhd. of Elec. Workers v. Hechler (In re Hechler)*, 481 U.S. 851, 865 n. 7, 107 S.Ct. 2161, 95 L.Ed.2d 791 (noting individual employee has right as third-party beneficiary to bring suit against his employer for violation of a CBA); *Mohr v. Metro E. Mfg. Co.*, 711 F.2d 69, 72 (7th Cir.1983) (same); *Anderson v. AT & T Corp.*, 147 F.3d 467, 473 (6th Cir.1998) (same).

67. *Smith v. Evening News Ass'n*, 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

68. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562, 96 S.Ct. 1048, 47 L.Ed.2d 231

(1976) (citing *Smith*, 371 U.S. at 198–200, 83 S.Ct. 267); *Gutierrez v. United Foods, Inc.*, 11 F.3d 556, 559 (5th Cir.1994). As noted by the court in *Gutierrez*, an employee must exhaust any grievance or arbitration procedures contained in the collective bargaining agreement before bringing suit, unless the union has breached its duty of fair representation. *Id.* at 559 n. 8. In addition, when asserting a breach of contract claim against an employer under § 301 of the LMRA, the employee must prove that the union breached its duty of fair representation, whether or not the union is named as a defendant. *Id.*

69. *Hines*, 424 U.S. at 562, 96 S.Ct. 1048; *Gutierrez*, 11 F.3d at 559.

70. *Gutierrez*, 11 F.3d at 560–61.

71. *Transcript of April 23, 2007, Deposition of Jeff Clark ("Tr.")* at 38, *in* Parks Appx. at 65.

ees.[72] Because it is undisputed that all of the Debtors were Union members, they had standing as third-party beneficiaries to enforce any employee benefits granted under the CBAs.

### 2. Intent to Be Bound by EPP Provisions

Debtors' standing as third-party beneficiaries of the CBAs, however, does not necessarily mean the CBAs granted them any contingent property interests in the SARS. The bankruptcy court concluded that the CBAs were not a source of property interests because "the SARS were to be granted or contributed pursuant to the EPP," not the CBAs, which the court characterized as merely an agreement to establish the EPP. The bankruptcy court noted that the EPP provisions in the CBAs indicate that the program will benefit only "participating employees," but it provided no definition of "participating employees." Because the "plain language" of the CBAs does not establish that Debtors would qualify as "participating employees," the bankruptcy court concluded that the CBAs did not grant Debtors any "enforceable right" to any benefit. But in determining whether the EPP provisions were merely "an agreement to agree" or whether they evidenced a binding agreement that would be formalized at a later date, the bankruptcy court should have considered the intent of the parties.

An "agreement to agree" or preliminary agreement can take different forms. A preliminary agreement may be formed when the parties have agreed on some, but not all, of the terms of an agreement and they enter into what is essentially a contract to negotiate in good faith to reach a final agreement.[73] In such cases, the preliminary agreement does not commit the parties to their ultimate contractual objective, but only to the obligation to negotiate the open issues in good faith.[74] Within the collective bargaining arena, this type of preliminary agreement appears to be rare. The LMRA imposes a statutory duty to negotiate the terms of a collective bargaining agreement in good faith,[75] making unnecessary a separate contract obligating a party to negotiate in good faith.

Another type of preliminary agreement is one in which the parties have agreed on all material terms and intend to later memorialize their agreement in a formal document.[76] In such instances, the agreement is preliminary in the sense that the parties intend to reduce their agreement to writing or to enter into another writing that formalizes the agreement. But formalizing the agreement is not essential, and lack of formalization does not preclude enforcement of the parties' binding agreement.[77]

This type of preliminary agreement occurs often in the labor arena, where parties reach an informal or oral collective bargaining agreement that they later in-

72. See Hines, 424 U.S. at 562, 96 S.Ct. 1048; Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 511 (9th Cir.1978) (holding employee had standing to enforce collective bargaining provisions relating to overtime pay).

73. See Alan Schwartz & Robert E. Scott, Precontractual Liability and Preliminary Agreements, 120 Harv. L.Rev. 661, 664 (Jan.2007).

74. Id.

75. 29 U.S.C.A. § 158(a)(5). See also Norris, a Dover Res. Co. v. N.L.R.B., 417 F.3d 1161, 1168 (10th Cir.2005) ("Parties must bargain in good faith to comply with the statutory duty, but bad faith is not a necessary element for a breach of the duty.").

76. Schwartz & Scott, supra n. 73, at 664.

77. Id.

tend to formalize.[78] Federal common law recognizes the enforceability of such agreements.[79] In this context, it is the intent of the parties that determines whether they have entered into a binding commitment.[80] Such intent need not be reflected in writing.[81] Courts also look to the surrounding circumstances and to the parties' conduct manifesting an intention to abide by agreed-upon terms.[82]

In order to determine whether the EPP provisions established a binding commitment, the bankruptcy court should also have determined whether the provisions contained sufficient terms to evidence an agreement or a "meeting of the minds." "Obligations under a collective bargaining agreement, like those under contracts in general, rest ultimately on the principle of mutual assent[.]"[83] To find a binding agreement, the parties must have agreed on the substantive terms and conditions of the contract.[84] A contract will not arise if the parties have not resolved a dispute over a substantive term.[85]

Clearly, the CBAs as a whole constituted valid, enforceable contracts. No party

disputes that, once ratified, the CBAs became binding on Spirit and the Unions. The EPP provisions must be considered in this context, in that they are but one term of what are otherwise valid, enforceable CBAs. The binding nature of the CBAs generally, however, is not conclusive because, as noted above, the EPP provisions might only be an agreement to negotiate in good faith.

The EPP provisions contain an agreement as to several key terms. Spirit explicitly commits to contribute SARS "representing a profit opportunity on 10% of the initial common stock" of its parent company. Through the EPP, it agrees to "distribute cash and common stock" following an IPO or other triggering event. In other words, the amount and types of distributions are established. The triggering events are defined. And the agreement to establish an EPP plan is expressed.

On the other hand, the "agree to establish" language is susceptible to two possible meanings. It could indicate a present agreement with the understanding that a

---

**78.** *E.g., United Steelworkers of Am. v. CCI Corp.*, 395 F.2d 529, 531–32 (10th Cir.1968) ("[T]he trial court was not clearly erroneous in holding that a binding verbal contract was intended by the parties pending a written formalization of their agreement.").

**79.** *E.g., Int'l Union, United Mine Workers v. Big Horn Coal Co.*, 916 F.2d 1499, 1502 (10th Cir.1990) ("The contract between the parties required for jurisdiction need not be a written, signed collective bargaining agreement, but may exist as any informal agreement between the parties significant to the maintenance of labor peace between them."); *Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir. 1987) ("The existence of a collective bargaining agreement does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms.").

**80.** *United Steelworkers of Am.*, 395 F.2d at 531–32.

**81.** *Mack Trucks, Inc. v. Int'l Union, UAW*, 856 F.2d 579, 592 (3rd Cir.1988) ("Adoption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound.").

**82.** *Id.; Local Union No. 1 v. Mel–O–Cream Donuts Int'l, Inc.*, 318 F.Supp.2d 711, 718 (C.D.Ill.2004) ("If the parties' conduct demonstrates a meeting of the minds as to the agreement, then an agreement has been formed, even if it is not yet reduced to writing.").

**83.** *Operating Eng'rs Pension Trust v. Gilliam*, 737 F.2d 1501, 1503 (9th Cir.1984).

**84.** *Mack Trucks, Inc.*, 856 F.2d at 591.

**85.** *See id.* at 593.

more elaborate formalization of the EPP will occur in the future. It could reflect an agreement not to be bound until the plan has been executed.

In addition, one of the terms of the EPP is not defined in the CBAs. As noted by the bankruptcy court, the CBAs do not define the term "participating employees." The lack of an explicit definition, however, does not necessarily mean there was no meeting of the minds on that term. If both parties understood its definition, then a binding agreement may have existed upon the ratification of the CBAs, despite the absence of a written definition. Again, the bankruptcy court should have determined whether the parties understood the meaning of this term.

To ascertain the meaning of "participating employees," a court should look first to the contract itself. If a collective bargaining agreement is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.[86] However, in construing the terms of a collective bargaining agreement, a court must remain aware that "collective bargaining agreements are not ordinary contracts and are not governed by the same common law concepts that govern private contracts[.]"[87] Often courts look at how a term is used throughout a collective bar-

gaining agreement to determine its meaning.[88] In some instances, a court "is entitled-and indeed, in some cases required-to look to the past practices of the parties and the 'common law of the shop' to determine the parties' contractual obligations" under a collective bargaining agreement.[89] This is especially true when "a disputed contract term is ambiguous on its face and no other language in the contract provides a basis for construing the term."[90]

The term "participating employee" is not defined by the CBAs. Although full copies of the CBAs are not in the appellate record, the parties point to no other portion of the CBAs that would shed light on the meaning of the term. I would therefore conclude, as a matter of law, that the term "participating employees" is ambiguous.[91]

Once an ambiguity is found, it is a general rule of contract construction that a court may consider extrinsic evidence to determine the intent of the parties. This rule is applied with "greater liberality" in the case of a collective bargaining agreement.[92] In the labor context, a trier of fact may consider the circumstances surrounding a collective bargaining agreement's execution, including the preceding negotiations, as well as the parties' conduct subsequent to contract formation, and

86. *Volkman v. United Transp. Union*, 73 F.3d 1047, 1050 (10th Cir.1996) ("If the language of the agreement is unambiguous, it may be construed as a matter of law without resort to extrinsic evidence of intent.").

87. *Id.*

88. *E.g., id.* at 1051–52 (reviewing collective bargaining agreement's use of "eligible employee" in various sections to determine meaning).

89. *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1243 (10th Cir.1998).

90. *Id.* at 1244.

91. *Id.* See also *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1173 (10th Cir.1999) ("A contract's silence on a particular issue does not create an ambiguity in every instance, but silence on a 'matter naturally within the scope of the contract' gives rise to ambiguity.") (internal quotation marks omitted).

92. *Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1517 (9th Cir.1985).

the practice, usage, and custom pertaining to collective bargaining agreements.[93]

## C. Contract Ambiguity in the Summary Judgment Context

Determining the parties' intent in the context of summary judgment motions is perilous. The construction of an *un*ambiguous contract is a question of law that properly may be determined on a summary judgment motion because the language of the contract is clear and the parties' intentions are not at issue.[94] But "in an ambiguous contract, if the intent of the parties is disputed, a genuine issue of material fact exists which cannot be determined summarily by the court."[95] So, in the ordinary case, when an agreement's meaning is not clear on its face and contrary inferences as to intent are possible, there exists an issue of material fact for which summary judgment is inappropriate.[96] Summary judgment would only be appropriate if contrary inferences of intent are not possible.[97] Contrary inferences are not possible "where undisputed and conclusive evidence as to the intent of the parties is before the court," such as clear and unambiguous evidence of the parties' bargaining history.[98]

I do not believe we have such conclusive evidence before us. The extrinsic evidence offered by the Trustees includes the slide show presentation dated May 12, 2005, the deposition testimony of Mr. Jeff Clark, the former Director of Union Relations for Boeing and later Spirit, and several S–1 Registration Statements that Spirit filed with the SEC prior to the IPO. The slide show presentation was prepared by Spirit to assist the Unions in presenting the EPP proposal to Union members prior to ratification of the CBAs.[99] It defines those employees eligible to participate in the EPP as those who work for Spirit "for at least three consecutive months during the first few months after it acquires Boeing Commercial's Wichita/Tulsa Division."[100] This definition, arrived at least a month prior to ratification of the CBAs, is consistent with the definition eventually included in the EPP plan document.[101] The slide show also lays out several other terms of the EPP that were eventually included in the plan document. Some details in the slide show, however, were not included in the final plan document, which reflects the preliminary nature of slide show. In addition, the slide show was prepared by Spirit, and thus does not necessarily reflect the Unions' understanding of the terms of the EPP. On the other hand, Mr. Clark testified that the Unions used the slide show to explain the EPP to their members and that the Unions even posted this presentation on their websites for access by members.[102]

93. *Id.* at 1517–18.

94. *Gomez v. Am. Elec. Power Service Corp.*, 726 F.2d 649, 651 (10th Cir.1984). *See also Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1151 (10th Cir.2000) ("Once a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues.") (internal quotation marks omitted).

95. *Gomez*, 726 F.2d at 651.

96. *Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund*, 753 F.2d at 1518.

97. *Id.* at 1518 n. 9.

98. *Id.*

99. *Tr.* at 18–21, 46, *in* Parks Appx. at 45–48, 73.

100. *EPP* at 7, *in* Davis Appx. at 121.

101. *EPP* at 3, *in* Davis Appx. at 57.

102. *See Tr.* at 18–19, *in* Parks Appx. at 45–46.

Mr. Clark's testimony was unequivocal in his understanding of the intent to be bound by the EPP provisions. He testified that, at the time the CBAs were ratified, Spirit understood the basic definition of the EPP "participating employees" and had an estimate of how many employees would participate.[103] Of course, the final number was not known until after the 90-day qualification period passed.[104] Nevertheless, Mr. Clark believed that Spirit had an agreement with the Unions about which employees would be eligible for the EPP.[105] Mr. Clark also testified that Spirit viewed the EPP provisions in the CBAs as binding, and that at the time the Unions ratified the CBAs, they had agreed to the key terms of the EPP program. According to Mr. Clark, Spirit "absolutely" intended to "honor the [EPP] language" in the CBAs.[106]

While acknowledging that certain details of the EPP program had to be worked out, Mr. Clark stated that at least the following key terms were agreed on at the time of ratification of the CBAs: the value of the SARS, who the "participating employees" would be, an estimate of how many union employees would participate, and how many SARS each eligible employee would likely receive.[107] According to Mr. Clark, the terms of the EPP that had *not* been fully worked out, and thus could not be included in the CBAs, involved creation of a trust and a board of advisors to independently oversee the program.[108] As it turns out, those elements were not needed, and were not included in the EPP plan document, because the IPO occurred relatively quickly after ratification of the CBAs.[109]

There are, however, some problems with Mr. Clark's testimony. Mr. Clark testified that during the labor negotiations with the Unions, he was still an employee of Boeing, not Spirit.[110] It is unclear from the record when Mr. Clark actually became an employee of Spirit. Further, Mr. Clark testified that he personally had no input in developing any of the terms of the EPP and did not write or approve of the slide presentation.[111] Thus, it is questionable whether his testimony meets the "personal knowledge" requirement of Federal Rule of Civil Procedure ("Rule") 56(e)(1) as to the EPP provisions and Spirit's intent. Moreover, Mr. Clark was never employed by the Unions and cannot directly testify to the Unions' understanding of the EPP provisions.

According to the S–1 Registration Statements filed by Spirit from June through November 2006, which was after ratification of the CBAs but prior to issuance of the EPP, Spirit had "agreed to establish a union equity participation program pursuant to which it will grant contingent stock appreciation rights ('SARs') . . . for the benefit of approximately 4,900 employees[,]" and that "1,000 SARs will be granted to each eligible employee."[112] The pertinent S–1 Statement then lists 4,900,000

103. *Tr.* at 28, 30, 40–41, & 102, *in* Parks Appx. at 55, 57, 67–68, & 130.

104. *Id.* at 28, *in* Parks Appx. at 57.

105. *Id.* at 105, *in* Parks Appx. at 133.

106. *Id.* at 49, 69, *in* Parks Appx. at 76, 96.

107. *Id.* at 40–42, 106–07, *in* Parks Appx. at 67–69, 133–34.

108. *Id.* at 20–21, 46, *in* Parks Appx. at 47–48, 73.

109. *Id.* at 20–21, *in* Parks Appx. at 47–48.

110. *Id.* at 7, 13, *in* Parks Appx. at 34, 40.

111. *Id.* at 20, *in* Parks Appx. at 47.

112. *Notes to Consolidated Financial Statements, in* Davis Appx. at 171.

SARS as "granted" but not "vested."[113] The S–1 Statements, like the CBAs, lack an explicit definition of "eligible employees."

Debtors respond to this evidence by arguing it is "controverted." Unfortunately, these bald protestations without more do not satisfy the requirements of Rule 56(e). They did not offer any contrary affidavits or evidence in another form allowed under Rule 56(e), but instead they argued that different inferences should be drawn from the Trustee's proffered evidence. Ordinarily, when both parties rely on the same evidence, it is difficult to view the evidence as "disputed" for summary judgment purposes. But when the issue of fact is one of intent and contrary inferences could reasonably be drawn from the same evidence, summary judgment is not appropriate.

I do not consider the extrinsic evidence presented to be conclusive on the intent of the parties. As discussed above, the evidence presented by Trustees goes primarily to Spirit's intent and it was made primarily by a witness who does not appear to have had either personal knowledge of the negotiations on this issue or the authority to speak for Spirit at the time of these negotiations. Nor did any of the parties present evidence of the Unions' intent or understanding of the EPP provisions. Given these deficiencies, I believe summary judgment was inappropriate and that the issue should be resolved at an evidentiary hearing.[114]

## V. Conclusion

I would remand this case to the bankruptcy court to take evidence on the intent of the parties to be bound by the EPP provisions of the CBA and whether there was a meeting of the minds on the meaning of "eligible employees." If the parties intended to be bound and there was a meeting of the minds on eligibility, then the bankruptcy court should determine if Debtors' interests were "sufficiently rooted in the [prepetition] past" so as to be considered property of the estate.[115] As discussed above, in the context of employee benefit cases, courts generally look to whether the payments at issue are based on a debtor's prepetition conduct or employment.[116] If necessary, courts prorate payments received postpetition so that only that portion which is based on prepetition conduct is included in the estate.[117]

---

113. *Id.*

114. *See Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1520 (9th Cir.1985) (overruling summary judgment where trial court did not have all the necessary information before it concerning ambiguous contract term, and the information it did have was not such as would support an award in favor of the appellee).

115. *Segal v. Rochelle,* 382 U.S. 375, 379–80, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966).

116. *See In re Booth,* 260 B.R. 281, 289–90 (6th Cir. BAP 2001); *In re Edmonds,* 273 B.R. 527, 530–31 (Bankr.E.D.Mich.2000), *aff'd,* 263 B.R. 828 (E.D.Mich.2001); *In re Carlton,* 309 B.R. 67, 71–73 (Bankr.S.D.Fla.2004).

117. *In re Booth,* 260 B.R. at 290; *In re Edmonds,* 273 B.R. at 531.