**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

In re: MARC WILLIAM DITTMAR,

    Debtor.

----------------------------

LINDA S. PARKS, Trustee,

    Appellant.

v.

MARC WILLIAM DITTMAR,

    Appellee.

No. 09-3230

_____

In re: FOREST EARL DENTON;
GERMAINE ANN DENTON,

    Debtors.

--------------------------

LINDA S. PARKS, Trustee,

    Appellant,

v.

FOREST EARL DENTON;
GERMAINE ANN DENTON,

    Appellees.

09-3233

—————————————————————————
In re: JOHN EARL HULSE,

Debtor.

------------------------

LINDA S. PARKS, Trustee,

Appellant,                                          09-3234

v.

JOHN EARL HULSE,

Appellee.

—————————————————————————

In re: PATRICIA A. LITTLE,

Debtor.

-------------------------

LINDA S. PARKS, Trustee,                            09-3235

Appellant,

v.

PATRICIA A. LITTLE,

Appellee.

—————————————————————————

-2-

In re: RICKY A. MURPHY;
DENISE L. MURPHY,

        Debtors.

--------------------------

LINDA S. PARKS, Trustee,

        Appellant,

v.

RICKY A. MURPHY;
DENISE L. MURPHY,

        Appellees.

_____

In re: CYNTHIA MY NGUYEN,

        Debtor.

--------------------------

LINDA S. PARKS, Trustee,

        Appellant,

v.

CYNTHIA MY NGUYEN,

        Appellee.

_____

09-3238

09-3236

-3-

In re: LARRY E. LETOURNEAU;
DONNA M. LETOURNEAU,

           Debtors.

--------------------------

LINDA S. PARKS, Trustee,

           Appellant,

v.

LARRY E. LETOURNEAU; DONNA
M. LETOURNEAU,

           Appellee.

09-3239

_____

In re: MICHAEL E. LOWE;
JACQUELINE E. FLOWERS-LOWE,

           Debtors.

--------------------

CARL B. DAVIS, Trustee,

           Appellant,

v.

MICHAEL E. LOWE; JACQUELINE
E. FLOWERS-LOWE,

           Appellee.

09-3237

Gaye B. Tibbets (Carl B. Davis, Davis & Jack, LLC, Wichita, Kansas, with her on the briefs) Hite, Fanning & Honeyman, L.L.P., Wichita, Kansas, for Appellants.

Michael J. Studtmann, (Don W. Riley, Law Office of Don W. Riley, Wichita, Kansas, Elaine Fleetwood, Ray Hodge & Associates, L.L.C., Wichita, Kansas, and David Lund, Wichita, Kansas, with him on the brief) Law Offices of Michael J. Studtmann, P.A., Wichita, Kansas, for Appellees.

Before **KELLY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

**KELLY**, Circuit Judge.

The Appellants, bankruptcy trustees ("Trustees"), appeal from the judgment of the bankruptcy appellate panel ("BAP"). The BAP determined that Appellees and debtors' ("Debtors") stock appreciation rights were not part of Debtors' bankruptcy estates under 11 U.S.C. § 541. A divided BAP panel affirmed the bankruptcy court's grant of summary judgment to Debtors, applying different reasoning. Our jurisdiction arises under 28 U.S.C. § 158(d)(1), and we reverse.

Debtors are former employees of the Boeing Company who became employees of Spirit AeroSystems, Inc. on June 17, 2005, when Spirit acquired Boeing's Wichita plant. In re Lowe, 380 B.R. 251, 252 (Bankr. D. Kan. 2007). At the time of the sale, Debtors' unions ratified substantially similar collective bargaining agreements ("the CBA") with Spirit. In re Dittmar, 410 B.R. 71, 74 n.7 (B.A.P. 10th Cir. 2009). During negotiations, Spirit proposed a 10% wage cut for union-represented employees. Lowe, 380 B.R. at 254. As an inducement, Spirit also offered to establish an equity participation program ("EPP") for union-represented employees and to contribute stock appreciation rights ("SARs") to the program if certain "payment events" occurred. Id. These SARs would expire in fifteen years if no payment event occurred. 1 Aplt. App. 159. The final CBA contained language that "[t]he parties *agree to establish* an [EPP]" for "participating employees." Lowe, 380 B.R. at 254. (emphasis added). The CBA did not provide a detailed description of the EPP and did not define the term "participating employees." Id. at 257. Prior to voting on the CBA, the union members attended a slide presentation discussing the EPP. Id. at 254. The slides indicated that participants would be awarded options (approximately 1,000 options per employee); an option was a right to share in Payment Event profits on one share of stock. 1 Aplt. App. 140, 147. The value of the option would be determined upon a Payment Event with a participant ultimately receiving

-6-

proceeds less the exercise price of the option. 1 Aplt. App. 142, 145 ("Following a Payment Event, cash or stock will be distributed automatically. The amount you receive will be net of the exercise price of the Option."). The slides further noted that "[w]e do not know when a Payment Event will take place, but [the company] is using a five-year period in their planning. The company . . . will want a Payment Event as soon as . . . the conditions are right for an optimal valuation." 1 Aplt. App. 152. The unions ratified the CBA on June 17, 2005. Lowe, 380 B.R. at 254.

Shortly after ratification of the CBA, Debtors filed their respective bankruptcy petitions over roughly a two-month period between August and October 2005. Dittmar, 410 B.R. at 80. On October 27, 2006, over one year after the bankruptcy filings, Spirit memorialized the EPP in a document. Lowe, 380 B.R. at 255. The full plan document defined which employees were eligible to participate in the EPP, as well as the SARs each eligible employee would receive under the EPP. Id. One month later, on November 27, 2006, a payment event (an IPO) occurred. Id. Ultimately, the SARs were worth $61,440 per employee. Id. Participating employees received $34,556 in cash around December 6, 2006, and 1,034 shares of Spirit Class A common stock around March 15, 2007. Id. at 255-56.

Trustees then filed motions to compel turnover of the distributions received from the SARs as property of the bankruptcy estate pursuant to 11 U.S.C. § 541. After a hearing, the bankruptcy court entered an interim order denying turnover. Dittmar, 410 B.R. at 80. After discovery, various trustees and debtors moved for summary judgment on the turnover motions. The bankruptcy court granted Debtors' motion for summary judgment and denied Trustees' motion, finding the distributions were not property of the bankruptcy estate. Lowe, 380 B.R. at 257-58. The bankruptcy court, relying on Kansas law, held that the CBA did not grant Debtors an enforceable right in the distributions because it did not clearly define which employees would have rights under the EPP. Id. at 257. The court noted that "participating employees" was not defined until the post-petition creation of the EPP. Id. The bankruptcy court concluded the right to the distributions was not part of the estate because Debtors did not have a contingent future interest until the EPP was created. Id. at 257-58.

A split panel of the BAP affirmed the bankruptcy court's judgment but utilized different reasoning. The panel majority determined that the bankruptcy court erred in "(1) relying upon Kansas contract law to interpret the CBA, (2) finding the CBA unambiguous, and (3) limiting its analysis to the plain language of the CBA." Dittmar, 410 B.R. at 79. However, the majority held that the Debtors did not have an interest in the distributions until the payment event occurred. Id. Until this time, Debtors had only a "hope, anticipation, or

-8-

expectation" in the SARs because those distributions "were entirely dependent upon the economic decisions of Spirit." Id. at 77. According to the majority, because Spirit had "discretion" over whether the payment event would occur, Debtors had no pre-petition interest in the distributions. Id. at 78. The dissenting member of the panel would have denied summary judgment and remanded for an evidentiary hearing on various issues. Id. at 95.

## Discussion

On appeal from a BAP decision, we review matters of law de novo and the bankruptcy court's factual findings for clear error. Melnor, Inc. v. Corey, 583 F.3d 1249, 1251 (10th Cir. 2009). "[W]e treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference (although they certainly may be persuasive)." Mathai v. Warren, 512 F.3d 1241, 1248 (10th Cir. 2008).

"For purposes of most bankruptcy proceedings, property interests are created and defined by state law. Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate" under § 541. Parks v. FIA Card Servs., N.A., 550 F.3d 1251, 1255 (10th Cir. 2008) (citations and quotations omitted); 11 U.S.C. § 541(a)(1).

We first consider whether and to what extent Debtors have an interest in the SARs under Kansas law. Butner v. United States, 440 U.S. 48, 55 (1979); see, e.g., Williamson v. Hall, No. KS-08-088, 2009 WL 4456542, at *8 (B.A.P. 10th Cir. Dec. 4, 2009) (holding that "pay on death" accounts were not part of the bankruptcy estate under § 541 because, under Kansas law, debtor had no property interest in the accounts until the death of the owner). We then consider whether that interest existed before Debtors filed their bankruptcy petitions. Finally, we turn to whether the SARs are property of the bankruptcy estate under § 541.

A.    Nature of Debtors' Interest

The parties do not address whether the distribution rights at issue would be considered a property interest under Kansas law, although Trustees generally note that Kansas law recognizes that contingent interests are property interests. Aplt. Br. 25; see also In re Allen Bros. Truck Lines, Inc., 329 F.2d 735, 737 (10th Cir. 1964). Our research has not uncovered any Kansas cases with similar facts. As a result, we must predict how the Kansas Supreme Court would rule. See, e.g., Boehme v. U.S. Postal Serv., 343 F.3d 1260, 1264 (10th Cir. 2003). To this end, "we are free to consider all resources available, including decisions of [Kansas] courts, other state courts and federal courts, in addition to the general weight and trend of authority." Id. (internal quotation marks and citation omitted).

-10-

Stock appreciation rights are a type of compensation that "give the holder the right to a cash payment or stock in an amount representing the difference between the market price and the fixed or strike price specified on the face of the SAR." Scholastic, Inc. v. Harris, 259 F.3d 73, 78 (2d Cir. 2001) (citing Searls v. Glasser, 64 F.3d 1061, 1064-65 (7th Cir. 1995)); see also FASB Accounting Standards Codification, Glossary, "Stock Appreciation Right" (2010). The SARs at issue in this case vested upon an IPO (or other payment event), and the distribution was the difference between the net offering price per share of the IPO and $10 (plus an incremental amount for each year). 1 Aplt. App. 159; see also Spirit Aerosystems Annual Report 2006 at 105 ("Upon the closing date of the IPO, all rights to receive stock were considered vested.").

Debtors' interest in the SARs is similar to an employee's interest in a stock option plan. See, e.g., In re Carlton, 309 B.R. 67, 69-71 (Bankr. S.D. Fla. 2004). Employees with stock options own contractual rights to purchase stock in the future that are subject to certain limitations of use and to the possibility of defeasance by later events. Id. at 72. Such postponed enjoyment does not disqualify these interests as property. Id. The Carlton court held that "[t]he fact that some of the Options had not accrued and were not exercisable as of the [bankruptcy] petition date, but whose exercise was contingent on the Debtor's continued post-petition employment, is of no consequence to the issue of ownership of the Options on the petition date." Id. That the EPP required a

payment event as condition precedent does not alter this analysis. See, e.g., Capital Health Management Group v. Hartley, 689 S.E.2d 107, 109 (Ga. Ct. App. 2009) (describing a SARs agreement where payment was contingent on the sale of company stock).

Once Debtors satisfied the condition for being participating employees (completing ninety days of employment for the new company), they were eligible to participate in the EPP. These employees held contingent property rights. While the value of the SARs before any payment event occurred may have been de minimis, that does not mean that Debtors did not have a property interest in the SARs. The nature of that interest and whether it is legally recognizable is a different question than its valuation.

B.     Creation of the Property Right

Trustees argue that the CBA, which was approved before Debtors filed for bankruptcy, created the SARs rights. Aplt. Br. 19-24. Debtors counter that, if their interest is a property interest, it was not created until the EPP was memorialized—which did not occur until after the bankruptcy filings. Aplee. Br. 7-8. The EPP provisions in the CBA indicate that the program applies to "participating employees," but "participating employees" was not defined within the CBA document. 1 Aplt. App. 161. The bankruptcy court concluded that Debtors did not have an enforceable right until the EPP document defined which

employees were "participating employees." <u>Lowe</u>, 380 B.R. at 257-58. Taking a different view, the BAP majority concluded that Debtors had a mere expectancy until the payment event occurred. <u>Dittmar</u>, 410 B.R. at 79. We believe the key question is whether the EPP provisions in the CBA were merely "an agreement to agree" or whether they evidenced a binding agreement that would be formalized at a later date. If the latter is the case, Debtors' property rights were created at the time the CBA was ratified.

While the bankruptcy court construed the CBA relying only on its plain language, interpretation of a CBA is governed by federal law. <u>See</u> <u>Allis-Chalmers Corp. v. Lueck</u>, 471 U.S. 202, 210 (1985). In the labor context, parties frequently reach informal or oral collective bargaining agreements that they later intend to formalize. <u>See</u>, <u>e.g.</u>, <u>United Steelworkers of Am. v. CCI Corp.</u>, 395 F.2d 529, 531-32 (10th Cir. 1968) ("[T]he trial court was not clearly erroneous in holding that a binding verbal contract was intended by the parties pending a written formalization of their agreement."). These agreements are enforceable under federal law, even when they are not reduced to writing. <u>See</u>, <u>e.g.</u>, <u>Int'l Union, United Mine Workers v. Big Horn Coal Co.</u>, 916 F.2d 1499, 1502 (10th Cir.1990) ("The contract between the parties . . . need not be a written, signed collective bargaining agreement, but may exist as any informal agreement between the parties significant to the maintenance of labor peace between them."); <u>Mack Trucks, Inc. v. Int'l Union, UAW</u>, 856 F.2d 579, 592 (3rd Cir. 1988) ("Adoption

-13-

of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound."); Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1987) ("The existence of a collective bargaining agreement does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms."). To determine the objective intent of the parties, courts may "look to the surrounding circumstances, and the parties' conduct manifesting an intention to abide by agreed-upon terms." Mack Trucks, 856 F.2d at 592 (internal citations and quotation marks omitted).

We disagree with the bankruptcy court's conclusion that the CBA is unambiguous. Lowe, 380 B.R. at 257-58. While many of the EPP provisions are established in the CBA document, there are at least two ambiguities.[1] First, the "agree to establish [an EPP]" language in the CBA is susceptible to two possible meanings: (1) it could indicate a present agreement with the understanding that formalization of the EPP will occur in the future; or (2) it could reflect an

---

[1] Because written CBAs are often skeletal in nature—and informal, unwritten labor agreements constitute enforceable CBAs—we are quicker to find ambiguity in a written CBA than we would with a traditional contract. See Big Horn Coal, 916 F.2d at 1502; Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1205 (9th Cir. 1989) (en banc) ("Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document.").

agreement not to be bound until the plan has been executed. In addition, the CBA does not define the term "participating employees."

The summary judgment record contains extrinsic evidence regarding the parties' intent: (1) the slides describing the EPP presented to the employees prior to the CBA vote, 1 Aplt. App. 137-156 ; (2) the deposition testimony of Jeff Clark, the former Director of Union Relations for Boeing and then Spirit, who testified about negotiating the CBA, 1 Aplt. App. 28-136; and (3) the SEC S-1 Registration Statements filed before the payment event, 1 Aplt. App. 159. This evidence is uncontroverted; both parties represented to this court at oral argument that there are no disputed material facts.

As noted, after the bargaining units and Spirit negotiated the CBA and the EPP, Spirit employees assisted in the preparation of a slide presentation that was used to educate union members about the EPP prior to the CBA vote. Aplt. Br. 6; Aplee. Br. 3. The slides indicated that the unions had "negotiated an [EPP] for eligible employees." 1 Aplt. App. 138. The slides described the nature of the SARs rights, how the rights would be allocated, and which employees would be eligible for the rights. 1 Aplt. App. 137-56. Mr. Clark testified that, "at the time of the bargaining agreement, . . . [t]here was a description about who would be eligible [to participate in the EPP]" and "an agreement . . . about what would constitute [SARs]." 1 Aplt. App. 191. Before the IPO payment event, Spirit filed

-15-

a series of S-1 Registration Statements with the SEC. Aplt. Br. 11-12; Aplee. Br. 5-6. One filing described Spirit's obligations regarding the EPP: "As part of the collective bargaining agreements, [Spirit] has agreed to establish a union [EPP] pursuant to which it will grant [SARs] . . . to each eligible employee . . . ." 1 Aplt. App. 159. Spirit then memorialized the EPP on October 27, 2006. Aplt. Br. 13; Aplee. Br. 5. The written EPP document contained identical terms to those described in the pre-vote slide presentation. Compare 1 Aplt. App. 143, 147-49, 153 with 4 Aplt. App. 916. Prior to the memorialization of the EPP, when employees had questions about the EPP, they were referred to the pre-vote presentation slides, which were posted online. Aplt. Br. 11; Aplee. Br. 5. This extrinsic evidence supports Trustees' position that the EPP terms were part of the CBA negotiations. Debtors have not offered evidence to the contrary. Accordingly, the evidence fully supports the contention that the CBA included a binding agreement about the EPP rather than "an agreement to agree" on the parameters of the EPP at some later point.

We agree with the BAP dissent that summary judgment is usually not an appropriate vehicle for determining the parties' intent about contract formation. Dittmar, 410 B.R. at 93-94. However, Debtors must raise more than some metaphysical doubt about whether the EPP terms were agreed on during the CBA negotiations given Trustees' proof on the issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). While intent is usually a question of fact, the

evidence supporting contract formation is uncontroverted, and the parties agree that there are no disputed material facts. Under such circumstances, remand for an evidentiary hearing is not warranted, and Trustees are entitled to judgment on this point.

C.      Property of the Bankruptcy Estate Under § 541

Under federal law, the bankruptcy estate includes, with enumerated exceptions, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). We have pointed out that the scope of § 541 is broad and should be generously construed, and that an interest may be property of the estate even if it is "novel or contingent." Parks, 550 F.3d at 1255 (internal quotation marks omitted); United States v. Rauer, 963 F.2d 1332, 1337 (10th Cir. 1992) (quoting United States v. Cardall, 855 F.2d 656, 678 (10th Cir. 1989), for the proposition that § 541 is broadly construed "to include all property interests, whether reachable by state-law creditors or not, and whether vested or contingent"); see also In re Barowsky, 946 F.2d 1516, 1518 (10th Cir. 1991) (discussing Congress's affirmative adoption of Segal v. Rochelle, 382 U.S. 375 (1966), in adopting § 541). Another circuit has likewise noted, "When a bankruptcy petition is filed, virtually all property of the debtor at that time becomes property of estate. . . . [E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of

-17-

11 U.S.C. § 541." In re Yonikus, 996 F.2d 866, 869 (7th Cir. 1993) (citations and quotation marks omitted). Even contingent interests that may or may not vest for years at the time of their creation are not necessarily excluded. In re Yeary, 55 F.3d 504, 505, 508-09 (10th Cir. 1995) (bankruptcy estate includes property subject to a creditor's security interest created years before the bankruptcy petition was filed).

Adopting the BAP majority's reasoning, Debtors argue that their interests were merely "the hope, anticipation, or expectation that in the event of a [payment] event, they would receive a share of the profits" because their interests were entirely dependent upon the economic decisions of Spirit. Aplee. Br. 12-13. This suggests that a contingent interest cannot become property of the bankruptcy estate unless the contingency is entirely in the control of the interest holder. Such a rule amounts to nothing more than a statement that virtually no contingent interest can be property of the bankruptcy estate—a position that clearly conflicts with our precedent. As discussed above, Debtors' interest in the SARs is similar to an employee's interest in stock options. As long as the employee had a legal interest in the options prior to filing for bankruptcy, the options are sufficiently rooted in the pre-bankruptcy past to become part of the bankruptcy estate. In re Allen, 226 B.R. 857, 865 (Bankr. N.D. Ill. 1998). That vesting of the options is contingent on a term of employment—a condition that is not exclusively within the employees' control—does not remove this pre-petition interest from the

bankruptcy estate.  See, e.g., In re Wick, 276 F.3d 412, 415 (8th Cir. 2002) (noting that unvested options contingent on continued employment are property of the estate because contingencies—even those that require additional post-petition services or those that may defeat the right to enjoyment of the property—do not bar a property interest from becoming part of the estate.).  Like stock options, the fact that the SARs are contingent on post-petition events does not mean that Debtors' interest in them is not rooted in the pre-bankruptcy past.

Neither the parties nor the courts below found any cases with similar facts. Instead they rely on contingent employee benefits cases where a program entitling the debtor to payment is in existence before the debtor files for bankruptcy and the eventual payment to the debtor is contingent on several factors, e.g., employment for a certain amount of time or profitability of the company.  These cases help illustrate when a contingent interest is rooted in the pre-bankruptcy past and when the interest is so speculative that it was a mere expectancy at the time the bankruptcy petition was filed.

One line of cases concludes that contingent interests are property of the bankruptcy estate even if the rights do not accrue or are uncertain until a date after the bankruptcy filing.  See Booth v. Vaughn, 260 B.R. 281 (B.A.P. 6th Cir. 2001); In re Edmonds, 273 B.R. 527 (Bankr. E.D. Mich. 2000), aff'd, 263 B.R. 828 (E.D. Mich. 2001).  The Booth court applied a broad reading of § 541.  There, the CBA

provided that hourly workers would receive a profit-sharing payout at the end of the year if (1) the employer made a profit and (2) the employee was employed through year end. 260 B.R. at 284. Mr. Booth filed for bankruptcy before a profit was realized and before the end of the year. Id. at 290. The court determined that the right to the bonus was a contingent interest that was property of the estate. Similarly, in Edmonds, the CBA provided that Ford employees would receive a profit-sharing payout at the end of the year if (1) Ford made a profit and (2) the employee was employed at the end of the year. 263 B.R. at 829. Mr. Edmonds filed for bankruptcy on December 15. Id. Noting that "plaintiff had worked all but a few of the days necessary to become entitled to his profit sharing," the court held that "the profit sharing payment is sufficiently rooted in the pre-bankruptcy past [to be] property of the estate under § 541(a)." Id. at 831. Thus, contingencies like continued employment and company profit do not transform the employee's interest into a mere expectancy that is excluded from the bankruptcy estate when the interest is rooted in the pre-bankruptcy past.

The BAP majority cited a second line of cases where employee bonuses were excluded from the bankruptcy estate. See In re Chappo, 257 B.R. 852 (E.D. Mich. 2001); Sharp v. Dery, 253 B.R. 204 (E.D. Mich. 2000); Vogel v. Palmer, 57 B.R. 332 (Bankr. W.D. Va. 1986). In Vogel, Mr. Palmer was entitled to receive a bonus if (1) he was employed on a date almost six months after the filing of his bankruptcy petition, (2) he performed his job satisfactorily, and most importantly,

(3) the company's chief executive officer determined Mr. Palmer was entitled to a bonus. 57 B.R. at 333. Because the award of the bonus was purely discretionary, the court held that Mr. Palmer's interest was "nothing more than a potential . . . of receiving an award." Id. at 335-36. In Sharp, Mr. Sharp was eligible for a bonus if he was employed in good standing when the company issued the bonus checks. 253 B.R. at 206. The timing of any bonus checks was at the employer's sole discretion, and the employer had the right to amend, suspend, or terminate the bonus plan at any time. Id. Mr. Sharp filed for bankruptcy on December 21 and received his bonus in February. Id. The court noted that under Michigan law, a worker does not have an enforceable right in bonus dividends before payment. Id. at 208. The court concluded that on the date he filed for bankruptcy, Mr. Sharp had no legal interest in the bonus check he later received on February 22 because his employer "could have decided not to pay any bonus at all under the terms of the bonus plan itself." Id. at 207-08. Finally, Chappo presents similar facts and an identical outcome. 257 B.R. at 852-55. Citing Sharp and Vogel, the court noted that the bonus plan contained "dispositive characteristic[s]": (1) the plan provided that the "Board of Directors at any time may terminate . . . or modify the Plan or suspend any of its provisions . . ." and (2) the bonus plan committee could "determine in its sole discretion not to make an Award to a particular Participant or group of Participants or to all Participants for any Plan Year." Id. at 854. At bottom, this line of cases suggests that an employer's promise to pay a bonus is

not enforceable where the employer reserves the right to withhold payment at its discretion. Thus, the employee had no right to the bonus at the time the bankruptcy petition was filed. Accordingly, the employee's interest in the bonus was a mere expectancy and should not be part of the bankruptcy estate.

We believe the SARs created by the CBA are more akin to the contingent pre-petition property rights described in the former line of cases than the mere expectancies based on discretionary bonuses described in the latter. Spirit had a contractual obligation to make payments if the IPO occurred. This obligation existed before Debtors filed for bankruptcy.[2] Debtors' interest in the SARs are sufficiently rooted in the pre-bankruptcy past. The SARs are properly part of the bankruptcy estate under § 541.

REVERSED.

---

[2] The record suggests that some of the debtors filed for bankruptcy before they had completed the ninety days of employment required to become participating employees. See, e.g., 4 Aplt. App. 887. Trustees correctly note that this does not prevent these debtors' interest in the SARs from becoming property of the bankruptcy estate, 4 Aplt. App. 967. See, e.g., DeNadai v. Preferred Capital Markets, Inc., 272 B.R. 21, 30-31 (D. Mass. 2001) (holding that unvested stock options, subject to the contingency of debtor's future employment, are property of the bankruptcy estate). However, absent these debtors' continued employment after they filed for bankruptcy, they would not have become participating employees. Accordingly, the bankruptcy court may need to apportion the SARs between such debtors and their bankruptcy estates. See, e.g., id. at 33-35 ("[R]ecognizing that the contingency upon which the exercisability of the options depends is continued employment of the debtor, courts have . . . consistently distributed the options on a pro rata basis so that only that percentage of the options that were earned pre-petition are brought within the bankruptcy estate.").

*Parks v. Dittmar*, 09-3230 *et al.*

**HOLLOWAY**, Circuit Judge, dissenting:

I respectfully dissent. I would affirm the judgment of the bankruptcy court. The Debtors' interests in the stock appreciation rights (SARs) were too uncertain to be included within their bankruptcy estates.

*Background.*

Almost all the relevant facts are noted in the majority opinion, and I will only mention facts that seem most critical to me. As noted in the majority opinion, the SARs at issue here were given for a fifteen year term (Maj. op. at 6), while Spirit told the eligible employees, including Debtors, that it was "using a five-year period" in planning, which implied that Spirit believed it likely that a "payment event" would probably occur within five years, if it were to occur.

The bankruptcy judge found that Spirit had absolute discretion whether to "sell, merge, or publicly offer stock," which were the three ways that a "payment event" could occur. *Parks v. Dittmar (In re Dittmar)*, 410 B.R. 71, 77-78 (B.A.P. 10th Cir. 2009) (quoting Bankruptcy Court's interim order). And there was a further contingency that applied to any of these three possible routes to issuance of the SARs: the "payment event" would first have to result in at least a fifteen per cent "annual profit" to "the initial equity investors."[1]

---

[1]It is unclear whether these terms were defined, but Debtors have not contended that these terms are ambiguous.

*The framework for the analysis.*

The majority opinion outlines three-steps for the analysis: first, whether the Debtors have a property interest in the SARs under Kansas law; second, whether the interest existed at the time the Debtors filed their petitions; and third, whether the property interests are property of the bankruptcy estate under 11 U.S.C. § 541. Maj. op. at 10. This seems to be correct, but applying the approach in this context presents a real challenge.

*Were the interests recognized as property under state law?*

On the first question – whether the benefits are an "interest in property" under Kansas law – we have previously held that as a general rule contingent interests are property in Kansas. *Kirby v. United States (In re Allen Bros. Truck Lines, Inc.)*, 329 F.2d 735, 737 (10th Cir. 1964). The property in that case was a contractual right. The bankrupt, a trucking company, had agreed to sell its certificate of convenience and necessity to another, with part of the consideration having been paid at the time of the agreement and the remainder to be paid upon approval of the transfer by the state agency with authority over the matter. Bankruptcy was declared before the sale had been completed. And before the bankruptcy petition was filed, the IRS had notified the buyer of the certificate that it claimed a tax lien on the payment contingently owed to the trucking company.

The bankruptcy trustee challenged the tax lien, arguing that there was no "property" to which the lien could attach.

On appeal, we held in favor of the IRS. The parties did not dispute that the certificate itself was property under Kansas law. The bankruptcy trustee, however, argued that because the contested balance of the payment for the certificate was not due until approval by the state agency had been obtained, there was no present property right in that balance. That contention was rejected. The court found no authority on the nature of the rights between the parties to this transaction, but held that "whatever the exact nature of those rights, they at least constitute a contingent liability, and under the law of Kansas, unmatured and contingent liabilities are subject to garnishment." 329 F.2d at 737.

Accordingly, I agree with the majority that the SARs at issue here are property rights under state law.

*Did the Debtors have rights when they filed their petitions?*

I agree with the majority that the evidence showed that the property interests came into existence with the execution of the collective bargaining agreements and thus were in existence when the Debtors filed their petitions.

*Were the Debtors' interests property of their bankruptcy estates?*

The third and pivotal issue is whether the Debtors' property interests in the SARs became property of the bankruptcy estates. Analysis here must begin with

the extremely broad language used by the Supreme Court and Congress to describe property of the estate. In a case under the Bankruptcy Act, the Court said that the bankruptcy estate includes "everything of value the bankrupt may possess . . . when he files his petition" and that an interest is not excluded "because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379 (1966). Our court and others have noted that Congress, in passing the Bankruptcy Code, specifically endorsed this language, so it remains valid. *See Barowsky v. Serelson (In re Barowsky)*, 946 F.2d 1516, 1518 (10th Cir. 1991).

As the majority opinion discusses, courts nevertheless have found that some property interests are too remote and speculative to be included in the bankruptcy estate. Significantly, the SARs in this case were subject to multiple contingencies and potentially to a very long period of uncertainty.

As the majority opinion notes, no cases have been cited or found that deal with facts closely analogous to those we deal with here. We are further hindered by the lack of analytical guidance offered by the cases. There does not appear to be even a framework to guide us as we contemplate the inherently inexact process of trying to determine what level of uncertainty must be present for a property interest to be outside the scope of section 541(a)(1), a scope that all agree is quite broad indeed.

As the dissenting judge on the BAP noted, while the

general principles governing property of the estate under § 541 generate little controversy, their application varies widely, especially regarding contingent property interests. . . . . [T]he varying analyses make it difficult to cull any settled, functional rule for determining when a contingent interest is property of the estate. At best, the case law can be said to exist on a continuum. At one end are contingent property interests that were clearly created and rooted in a debtor's pre-bankruptcy past, such as a prepetition contract that will result in the debtor receiving payments postpetition. At the other end of the spectrum are interests so amorphous, so speculative, or subject to so many contingencies, that courts deem them to be "mere expectancies," rather than existing property interests. Most interests fall in between these two extremes, and often have a mix of characteristics that make it very difficult to ascertain whether the interest has crossed the line from "mere expectancy" to contingent property interest within the scope of § 541.

*Parks v. Dittmar (In re Dittmar)*, 410 B.R. 71, 84-85 (B.A.P. 10th Cir. 2009) (Brown, J. dissenting) (footnotes omitted).

One clear principle that should undergird our analysis is that the facts must be considered as of the date that the Debtors filed their petitions. The bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The trustee "succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition." *Weinman v. Graves (In re Graves)*, 609 F.3d 1153, *2 (10th Cir. 2010) (quoting *In re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992)). A second overriding policy is "that bankruptcy cases be handled in a speedy and expeditious manner." *Turney v. FDIC*, 18 F.3d 865, 869 (10th Cir. 1994) (quoting 2 *Collier on Bankruptcy*, ¶ 102.02 (15th ed. 1993)).

The majority finds that cases involving annual employee bonuses have the most similar context and therefore provide some guidance for our task. Maj. op. at 19-22.[2] As discussed in the majority opinion, a single factor appears to distinguish at least some of the cases holding that an employee bonus is property of the employee's bankruptcy estate from those holding the bonus is not property of the estate. That factor is whether the employer had discretion to withhold a bonus, even when all conditions attached to the bonus by that particular employer were satisfied.

The majority apparently accepts the reasoning of the courts which hold that employer discretion whether to grant an annual bonus or not may be decisive. The majority apparently concludes, however, that although discretion whether to award a benefit results in the benefit being outside the bankruptcy estate, discretion to control the conditions that activate the awarding of the benefit does not. I find the distinction unconvincing.

If employer discretion is to be the controlling factor, then I see no reason why the discretion vested in the employer here – which was absolute discretion to create or eschew creating the conditions that would lead to Debtors eventually receiving tangible benefits – should be an exception to such a rule. Moreover, this

---

[2]More specifically, all the cases cited and discussed in this part of the majority opinion involve bonuses that had not been paid at the time bankruptcy proceedings were commenced but which had, at least arguably and at least partially, been earned at that time.

-6-

case can and should be decided without adopting the rule that employer discretion is controlling, as was done in the employee bonus cases cited by the BAP such as *Vogel v. Palmer (In re Palmer)*, 57 B.R. 332 (Bankr. W.D. Va. 1986).

In this case, the employer not only had discretion whether to initiate any "payment event" and thus activate its obligation to create the SARs, but its obligation was further conditioned on an arbitrary factor that the event first had to create at least fifteen percent annual profit for the initial investors. Further, and quite significant in my view, the employer here, unlike in the cases discussed by the majority and cited by the parties, retained the power to postpone its decision for up to fifteen years. Given the majority's apparent agreement with cases that hold that employer discretion either to pay or to withhold an annual bonus results in the benefit being outside the bankruptcy estate, one would expect that the benefit in this case, with its multiple contingencies and prolonged period of latency, would be an *a fortiori* case in which the SARs are outside the bankruptcy estates.

It is not necessary for this panel to endorse the holdings of those courts that have held that employer discretion to pay or withhold an annual bonus to an employee results in the bonus being outside the bankruptcy estate. Here we have not just that one factor, but the additional contingency that the event over which the employer had control must have occurred with certain results (realization by

the "investor group" of at least a fifteen per cent annual profit). Further, unlike the facts in the employee bonus cases discussed in the majority opinion, we also deal with a context in which the potential benefit was not certain to become payable, if at all, within a few months of the bankruptcy filing but potentially anytime within the following fifteen years.

Viewing these Debtors' property rights in the SARs at the time of the commencement of their cases, and mindful of the policy mandating expeditious handling of the estates, I conclude that the SARs were properly held by both courts below to be outside the bankruptcy estates and so not subject to turnover to the Trustees.

*Conclusion.*

It is challenging to find the demarcation between contingent property interests that are properly included in the estate of a bankrupt and those that are so extremely novel or contingent that they are not so included. I conclude and would hold that the SARs at issue here were not part of the Debtors' estates because at the critical time that the petitions were filed by the Debtors, the interests were subject to multiple contingencies, including the likelihood that they would remain only contingent interests for some years post-petition. I therefore respectfully dissent.